SOUTHERN DISTRICT OF MISSISSIPPI
FILED
JUL 23 2024
ARTHUR JOHNSTON
BY ______ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

**(Northern Division)**

| | | |
|---|---|---|
| Terrence Lee Wogan II<br>Heather Lee Wilkes<br>3333 Keating Rd.<br>Pensacola, FL 32504<br>504-535-4735 or 850-400-3950 | ) | Case Number: 3:24-cv-431-TSL-RPM |
| Plaintiff's, | )<br>) | |
| V | )<br>) | |
| City of Ridgeland Mississippi,<br>Ridgeland Police Officer's<br>April Rose, Hunter Bridges<br>Ben Johnson,<br>Supervisor John Doe<br>100 W. School St.<br>Ridgeland, MS 39157 | )<br>)<br>)<br>) | Jury Trial Demanded |
| Defendants, | )<br>) | |
| ______________________________/ | | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. COMES NOW, Plaintiff's, Terrence Lee Wogan II and Heather Lee Wilkes, both proceeding pro se, with a complaint against Defendant(s) Officer April Rose, Sargeant Hunter Bridges, Officer Ben Johnson, Supervisor John Doe and the City of Ridgeland, Mississippi, and hereby states and alleges the following.

## INTRODUCTION

2. On July 25th, 2021, the Plaintiff's pulled off the interstate to rest and lawfully parked at 11:58 pm in the Renaissance Mall parking lot. On July 26, 2021, around 2:38 am, Officer April Rose initiated contact with the Plaintiff's by tapping on the rear window of the vehicle with her flashlight waking them up. She then announced herself as a Police Officer explaining she was just getting up with them because the businesses were closed. She immediately asks for identification from both Plaintiff's.

3. Shortly after requesting identification, Defendant Rose, while using her flashlight to look through the back window, saw a single double shot fireball bottle, that was empty and contained no amounts of liquid. There were no other bottles in the vehicle and no other reason to suspect DUI.

4. During this encounter officers are alleged to have conspired together to make Plaintiff's wait for thirty-three minutes awaiting the arrival of a K-9 unit. Subsequently, Defendant Johnson tells the other officers that "Titus" (police K-9) signaled a positive alert.

5. Defendant Johnson is alleged to conspired with Officer Bridges, about eight minutes into search (not yielding any results), saying he thought they would find something followed by saying, " make sure she (Wilkes) "***doesn't***" get searched." The seizure lasted a total of 82 minutes.

6. Exacerbating the circumstances, Defendant Rose violated Mrs. Wilkes' Fourth Amendment rights, specifically the protection against unreasonable search and seizure, as well as her Fourteenth Amendment rights to Equal Protection and Due Process. Officer Rose proceeded to unlawfully arrest Mrs. Wilkes for a misdemeanor, which is only permissible under certain

conditions: when the individual poses a threat to themselves, is involved in a breach of peace, or has an outstanding warrant. During the transport to the jail, Officer Rose demonstrated a blatant disregard for the safety and well-being of Mrs. Wilkes by exceeding the posted speed limits by 10 mph on two occasions and running two separate stop signs while making left-hand turns, one of which was executed without reducing speed below nine mph.

7. The City of Ridgeland is alleged to be at fault for the supervisor's failure to conduct proper interviews or adhere to established policies during this incident. The city of Ridgeland, through the Ridgeland Police Department, the local courts, and the City's Prosecuting Attorney, all engage in a pattern of misconduct that often deprive citizens of rights and privileges secured and protected by the United States Constitution and federal law.

8. In light of the aforementioned events the Plaintiff's contend that the defendants in conjunction with the City of Ridgeland violated their Fourth and Fourteenth Amendment Rights.. Additionally, the city's supervisor's failure to follow multiple laws and policies, thereby breaching their duty.

9. The Plaintiffs seek remedies from the Court including but not limited to:

A. Declaratory judgement affirming the violation of constitutional rights.

B. Injunction relief to prevent future violations and ensure proper training and adherence to policies by law enforcement.

C. Monetary damages, (compensatory, general and punitive) for the distress and harm caused by the unlawful seizure, arrest, and subsequent events.

D. Sanctions as the court would deem appropriate.

10. The Plaintiff's bring this complaint seeking redress for the violations of their rights and seeking a fair and just resolution from this honorable court.

**JURISDICTION AND VENUE**

**42 U.S.C. § 1983 AND 18 U.S.C. §§ 241-242**

11. This action arises under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments, including but not limited to, unlawful seizure, the extended period of time of said seizure ,unlawful search, submitting two false affidavits and intentional infliction of emotional distress, equal rights, and due process. The Plaintiff's also invoke 18 U.S.C. § § 241 and 242, alleging conspiracy against rights and deprivation of rights under color of law.

**SUBJECT MATTER - 28 U.S.C. § § 1331 AND 1343**

12. Jurisdiction is proper under 28 U.S.C. § 1331, as this case presents a federal question involving the violations of Constitutional Rights and § 1343, providing jurisdiction of civil rights actions.

**VENUE - 28 U.S.C. § 1391(b)(2)**

13. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as all events or omissions giving rise to this complaint occurred in this judicial district.

## SUPPLEMENTAL JURISDICTION

14. Pursuant to 28 U.S. Code § 1367 this court has Supplemental jurisdictions for all other claims arising under Mississippi State or local law, given they are from the same controversy and original jurisdiction.

## AUTHORITY OF CLAIMS

15. The Plaintiff's assert that this Honorable Court has authority over the subject matter of this action and is appropriate venue for the adjudication of the federal, state, and local claims herein. The Plaintiff's request this court to exercise its authority to hear all claims and grant appropriate relief as provided by law.

## PARTIES - PLAINTIFF'S

16. Plaintiff, Terrence Lee Wogan II, (hereinafter referred to as "Wogan") is an adult resident of Escambia County Florida and may be served at his mailing address, 3333 Keating Rd. Pensacola, FL 32504.

17. Plaintiff, Heather Lee Wilkes,(hereinafter referred to as "Wilkes") is an adult resident of Escambia County Florida and may be served at her mailing address, 3333 Keating Rd. Pensacola, FL 32504

**PARTIES – DEFENDANTS**

18. Defendant, City of Ridgeland, (herein after referred to as "City") with this suit being brought through its official capacity, is a municipality duly incorporated under the laws of the State of Mississippi. The "City" is a political subdivision of the State of Mississippi and is the entity responsible for the management and funding of the City of Ridgeland Police Department (hereinafter referred to as "RPD.") Miss. Civ. Procedure Rule 4(d)(7) states a municipal corporation may be served by delivering a copy to the mayor or municipal clerk, located at 100 W School St. Ridgeland, MS 39157.

19. Defendant, Officer April Rose, (herein after referred to as "Rose") with this suit being brought through her official and individual capacity and at all times relevant herein was an Officer employed through the "RPD" by the "CITY" and can be served with the city clerk at 100 W School St., Ridgeland, MS 39157.

20. Defendant, Sargeant Hunter Bridges (herein after referred to as "Bridges"), with this suit being brought through his official and individual capacity and at all times relevant herein was employed through the "RPD" by the "CITY" and can be served at the city clerk at 100 W School St., Ridgeland, MS 39157.

21. Defendant, K-9 officer Ben Johnson (herein after referred to as "Johnson') with this suit being brought through his individual and official capacity and at all times relevant herein was employed through the "RPD" by the "CITY" and can be served at the city clerk at 100 W School St., Ridgeland, MS 39157.

22. Supervisor John Doe (herein after referred to as "S Doe") has this suit being brought through his individual and official capacity, and at all times relevant herein was

employed through the "RPD" by the "CITY" and can be served at the city clerk at 100 W School St., Ridgeland, MS 39157. He is believed to be a Supervisor for the manner he spoke and asked questions and through proper discovery, the identity of this Supervisor should become apparent.

## STATEMENT OF FACTS

### EXHIBIT A and B

23. Attached hereto as Exhibits A and B are crucial pieces of evidence. Exhibit A contains the transcript of audio recordings from police body microphones, while Exhibit B comprises the corresponding video recordings. The Plaintiff lawfully obtained these videos from the City of Ridgeland and have been burned onto DVD/CD-type disks. These videos can only be played on a proprietary video player included on each disk and are not compatible with standard media players such as Windows Media Player, thereby restricting functionalities such as enlarging, slowing down, or performing other types of playback functions. Accompanying these videos are chain of custody reports. The recordings in Exhibits A and B provide essential factual evidence, illuminating the events in question and substantiating the allegations made in this complaint. All referenced events from the morning of July 26, 2021, are documented and can be verified through these videos, which correlate with their respective times in both Exhibits A and B.

## BACK HISTORY – NARCOLEPSY

24. In 2001, Mr. Wogan was diagnosed with narcolepsy following a sleep study and multiple sleep latency test at Walter Reed Medical Center while serving in the Army. Narcolepsy is a chronic neurological disorder characterized by excessive daytime sleepiness, abnormal REM sleep patterns, and episodes of sleep paralysis.

25. One symptom of narcolepsy is cataplexy, which involves sudden muscle weakness that can range from slight weakness at the knees to an inability to speak clearly. Mr. Wogan experiences frequent and rapid transitions in and out of REM sleep, unlike the typical 90-minute onset for REM sleep. Upon waking, Mr. Wogan may experience confusion and disorientation, a condition known as sleep drunkenness, which makes it difficult to understand his surroundings or communicate effectively. These episodes can last from a few minutes to up to an hour and may cause behaviors that could be misinterpreted as intoxication..

## BACK HISTORY – JULY 24 -25, 2021

26. Plaintiff's Mr. Wogan and Mrs. Wilkes were on the way from Memphis, TN/Tunica, MS area to Vicksburg, MS where they had a hotel reservation at the Ameristar Casino. While driving into the Jackson, MS area, Mr. Wogan began feeling like he could no longer stay awake. Mr. Wogan searched for a rest stop on his phone. With the closest one being well over an hour away, Mr. Wogan decided to pull off the first exit. When getting off the exit the first two rights put him in the Renaissance Mall parking lot. He then picked an open spot

underneath a working light, parked, and nodded off. Mr. Wogan parked his car at 11:58 p.m. on July 25, 2021.

27. On July 24th, the Plaintiff's A/C compressor had seized in which the entire night and the next morning was spent getting parts and making repairs in the heat before the Plaintiff's started making their way to Vicksburg, MS.

## INITIAL CONTACT – BEGINNING OF UNLAWFUL SEIZURE

28. On July 26, 2021, at 2:38 a.m. Defendant Rose parked her marked police cruiser behind Mr. Wogan's vehicle, turns on her spotlight, directing spotlight towards the driver's side of the car. Defendant Rose then walks to the passenger side and uses flashlight to look in windows, spending about a minute doing so.

29. At 2:42 a.m. Defendant Rose walks towards the driver's side of the car and knocks on the back window, waking up Mrs. Wilkes and then Mr. Wogan. Defendant Rose says, "Hey, I'm officer Rose with the Ridgeland Police Department, just getting up with you, businesses are closed." Wogan then says, "had just pulled off the interstate, I was starting to fall asleep."

30. Defendant Rose then asks itinerary questions , then for ID's. While waiting for ID's Defendant Rose, shines the flashlight in backseat, sees an empty fireball bottle then asks Wogan, "how much of that fireball have you had tonight?" Wogan explains to Rose that his car's a/c clutch went out and during repairs must have come out of trash.

31. At 2:45 a.m. Defendant Rose calls in the Identifications of both Wogan and Wilkes. Rose then proceeds back to the driver's side of vehicle and starts interrogating Mr.

Wogan and Mrs. Wilkes. The following are some of the questions asked, "What took you guys to Memphis?" ,"is the delivery stuff more lucrative in Memphis?" ," Gas is cheaper? Cheaper than in Pensacola?" , "How long have you guys been in Pensacola?"

## ARRIVAL OF SARGEANT BRIDGES

32. At 2:48 a.m.(eight minutes elapsed) Defendant Bridges, also employed by the "RPD" arrives, and parks his marked police cruiser facing the front passenger side quarter panel of Wogan's vehicle and also turns his spotlight onto the Plaintiff's' car. Defendant Rose says to Defendant Bridges, "So they were both asleep, he was like passed out drooling on himself…and…I'm thinking." Bridges then says, "where are they coming from?" After her answer, Bridges then asks, "Why they stop here?" Defendant Rose explains Wogan was falling asleep. Bridges asks, "both out of Pensacola?" and "Married?." After Rose says, "don't know." Bridges says, "did you see if they let you look in the vehicle."

33. Defendant Bridges then approaches the passenger side of the vehicle while Defendant Rose simultaneously approaches the driver's side of the vehicle.

## DISCLOSURE OF NARCOLEPSY

34. At 2:50 a.m. (ten minutes elapsed) Bridges asks Wilkes "why can't you drive?" Wilkes replies, " I mean I can drive now, I was sleeping" Also Plaintiff Wilkes at this time tells the officers that Wogan has Narcolepsy.

35. The following is the conversation that pursues next between "Rose" and "Wogan"

***Rose:*** "You guys have anything illegal in the vehicle?"

***Wogan:*** "No mam"

***Rose***, "Weapons?,"

***Wogan*** "No mam"

***Rose***, "Marijuana?"

***Wogan***, "No mam"

***Rose***, "Heroin?"

***Wogan***, "No mam,"

***Rose***, "Cocaine?"

***Wogan***, "Why would I have any of that? No mam.,"

***Rose***, Can I check?"

***Wogan***, "No mam"

36. After Defendant Bridges, goes through same line of questioning, at 2:52 a.m. (twelve min elapsed) Bridges says to Wogan, "how about you hop out for a second." Wogan complies with the request and exits the car.

37. Twelve minutes and thirty-one seconds into the unlawful seizure, Wogan exits the vehicle with Bridges continuing to ask questions about itinerary.

## WOGAN'S PERSISTENT QUESTIONING OF SEIZURE

38. Exactly fifteen minutes into the unlawful seizure Plaintiff Wogan asks if he is free to leave. He repeats the question two seconds later. Defendants Rose and Bridges both ignore the question. Bridges immediately starts asking Wilkes, "how much meth is in the vehicle tonight?"

39. At 2:55:57 (~fifteen minutes elapsed.) Bridges says, "Not much to go off of." Two second later he states, "I mean they're sketchy."

40. At 2:56:48,(~seventeen minutes elapsed) Plaintiff Wogan for the third time asks, "Am I free to go?" Both Defendants Rose and Bridges again ignore the question.

## BRIDGES TELLS WOGAN HE IS DETAINED – WOGAN INVOKING SILENCE

41. At 2:57:14, (~seventeen minutes elapsed) Plaintiff Wogan asks, "Am I being detained or" and at this time Defendant Bridges says, "yeah, hang on one sec man"

42. At 2:57:29, Plaintiff Wogan states, "I'm not answering anymore questions."

## BRIDGES PHONE CALL TO JOHNSON

43. At 2:57:47, Defendant Bridges calls Defendant Johnson. (Phone conversation can heard on both Defendants Rose and Bridges body microphone) Defendant Bridges can be herd during phone call saying, "We don't have anything else other than, he's not, he's not saying anything."

44. During the time of this phone call, Defendant Rose says, "this is private property, correct? Then a couple minutes later saying. "Or is it municipal?"

45. During the phone call Johnson asks the following questions, (a) Type of car? (b) Windows down? (c) Parking lot? (d) Length of time on scene (Bridges says five minutes, actual 18m59s)

## BRIDGES QUESTIONS LEGAL AUTHORITY -CONSPIRACY TO STALL

46. At 3:00:26 a.m., (twenty minutes elapsed) Defendant Bridges says, "I've never arrested anyone with…They got here from the roadway, I mean public roadway, I would think you could still get them with open container. Never dealt with that before."

47. At 3:01:40, twenty-one minutes and forty-three seconds since the unlawful seizure began, Defendant Bridges conspires with Rose to stall after Johnson confirmed to Bridges that he would be on the way. Bridges says, "You could always, you could offer him, if you can like ask him if he's had anything. If he's taken anything. Doesn't mind us taking (FSST's*?) make sure he's good to drive, that way while we are waiting for."

**WOGAN REQUESTING BREATHALYZER**

48. At 3:02:02, twenty-two minutes and five seconds into interaction Rose asks Plaintiff Wogan to do sobriety tests "to make sure you are good to drive." Plaintiff Wogan then tries to say no four times and says he'll do a breathalyzer four times.

49. At 3:03:41, Bridges asks Rose if she has a portable breath test. Rose responds, "I do but um, the test I want to do is a little more reliable." Bridges responds, "yeah that's fine."

**WOGAN QUESTIONING LENGTH OF SEIZURE WITHOUT RESPONSE**

50. At 3:07:53, Plaintiff Wogan asks, "You guys aren't trying to extend this stop waiting on a dog, are you?" Rose then says, "Sir?" Plaintiff Wogan then repeats the question with the response from Bridges being, "I'm trying to make sure you are good to be driving."

51. For the fifth, sixth and seventh time, Plaintiff Wogan tries to say no to taking more test and asks for the fifth and sixth time for a breathalyzer.

52. At 3:10:48 a.m., (thirty minutes elapsed) for the second time Plaintiff Wogan says, "I'm not going to answer any more questions." And shortly after "I wanna know why I'm not free to leave?"

## BRIDGES EXPRESSING OPINION OF WOGAN'S SOBRIETY

53. At 3:10:59 a.m. Bridges says, "I don't know, I don't think he's been using, he may have used, but I don't know, It's just very odd."

## WOGAN NOT CONSENTING TO DOG SNIFF

54. At 3:12:49 a.m. Plaintiff Wogan says, "I do not consent to the dog walking around my car."

## BRIDGES SAYING WHEN WE ARREST

55. At 3:14:57 a.m., Bridges says, "When we arrest them, we need to articulate all the reasonable suspicion, talk to him and he said he had been arrested before. He's been arrested seven years ago, and she was arrested about a year ago, but he wouldn't say for what. She used to use it. She would smoke it. He appears to be on a stimulant, their story about going to casino to casino, very vague and frank. It doesn't make sense. He's been in this situation before so."

## ALLEGED POSITIVE ALERT

56. At 3:16:18, (thirty-six minutes elapsed) Defendant Johnson walks the dog only on the driver's side of vehicle, with his microphone off (giving ability for Johnson to give audible command(s)), as well as it being the only area of the car that wasn't in view of a camera. Johnson says there is a positive alert thirty-six minutes and twenty-five seconds into the unlawful seizure. The dog sniff lasted for a total of nine seconds.

57. Defendant Johnson in affidavit of positive alert, page six of investigative report, states, "K9 Titus showed JND (just noticeable difference) at the driver's side door and he went to a final response on the driver's door seam. Titus's response showed a positive alert for odor of an illegal narcotic."

58. The Plaintiffs allege that neither an active nor passive response took place and for the following reasons:

A. Dogs can either pant or sniff, but they cannot do both at the same time. The temperature was 86 degrees and could hear the dog in the background barking extensively, exerting a lot of energy. Dogs don't have sweat glands and rely on the panting to cool their body.

B. The car windows were down. With them down it is less likely the K-9 would alert on the door seem or window. Typically, a well-trained police dog is trained to detect scents emanating from within the vehicle. If the window is down the pressure would not be present to push air through the door seems. The scent would likely disperse more freely, and the dog would focus on the source than alerting on the door or window area.

C. Defendant Johnson can be seen moving his arm towards the vehicle only once believed to be a hand que instructing Titus where to alert.

D. With the passing of the 2018 Farm Bill, which legalized hemp containing less than 0.3% THC, law enforcement agencies are no longer permitted to use K-9s trained to alert specifically to THC. This change in the law mandates that dogs previously trained to detect THC must be retired from active duty or retrained. Given this legal backdrop, the circumstances of this case suggest one of two concerning scenarios: (1) either the police dog in question was improperly trained to alert to THC, contrary to federal regulations, or (2) Officer Johnson falsely claimed that the K-9 alerted to the presence of illegal substances when no such alert occurred. Both scenarios indicate a severe breach of protocol and raise serious questions about the integrity of the officers' conduct during the incident.

59. The Plaintiff's, because of these factors contend that the alert of Titus to be "highly unlikely."

**OFFICER'S UNLAWFUL SEARCH OF WOGAN'S PERSON**

60. At 3:18:48 a.m., Plaintiff Wogan was searched without a warrant and without being arrested.

## JOHNSON CONSPIRING WITH BRIDGES

61. At 3:22:43 a.m., forty-two min and forty-six seconds into the unlawful seizure and six minutes twenty-one seconds after positive alert and search starting, Bridges and Johnson have following conversation

**Johnson:** *"Getting out of here buddy"*
**Bridges:** *"Alright, Yeah, I'll let you know. Very odd, they may not have anything, but"*
**Johnson:** *"Dude, she sat in this car the whole time, she's probably got it."*
**Bridges:** *" Nah, we were with her, sitting with her, she didn't move."*
**Johnson**: *"There was nobody with her when I got here."*

62. At 3:25:16 a.m., eight minutes and fifty-eight seconds since search started, the officers still have not found anything in the vehicle. Johnson then starts the following conversation with Bridges.

**Johnson:** *"I was pretty sure you guys were going to find something, so....make sure she doesn't get searched."*
**Bridges**: *"You don't want her searched?"*
**Johnson:** *"No."*

## OFFICERS FINDING DUGOUT

63. At 3:29:27, a dugout with very little residue and a one hitter pipe without residue was found in the bottom of Wilkes purse inside of two separate zip lock bags. Wilkes purse is a backpack style purse, and it was at the very bottom.

## SUPERVISOR JOHN DOE ARRIVES

64. At approximately 3:36 a.m., "S Doe" arrives at the scene and engages in questioning of situation with Defendant Rose and Defendant Bridges. The following dialogue unfolds:

**Doe:** *"At any point in time did you have your blue lights on?"*
**Rose**: *"No"*
**Doe:** *"At any point in time did they ask to leave and you so no?"*
*"I'm just trying to see what I have to work with on them"*
**Rose:** *" Um, so he was asking, if was detained or free to leave and I deferred to Bridges."*
**Doe:** *" And what did he say?"*
**Rose:** *"Bridge's?"*
**Doe:** *"Uh huh"*
**Rose:** *"He didn't specifically say and then I went in to if he would do "?"(test*), to make sure he was good to be driving before we let him go. Because I did have some concerns about him being on something and us letting him go while he was on something"*
**Doe:** *"I gottcha, but he never got told he wasn't free to leave? Directly?"*
**Bridges:** *"I told him. Yeah, I told him"*
**Doe:** *"ok"*
**Bridges:** *"I said at that point he was detained."*
**Doe:** *"For what?"*
**Bridges:** *"umm. stories not adding up, um. Appeared to be on something, she was going to run some fsst's on him, open bottle of fireball."*
**Doe:** *"So they had an open container, huh?"*

## "S DOE" LASHES OUT ON WOGAN

**Doe:** *"Hey Buddy, you had an open container of fireball in there, right?"*
*"You did, right?"*
**Wogan:** *"Yeah it was empty."*
**Doe:** *"it's not a consensual encounter when you are breaking the law, so all the detention BS you are claiming is garbage."*

65. The statements made by S. Doe are presented to illustrate the individual's lack of proper training, knowledge, and professionalism expected of someone in a supervisory role. A competent supervisor would never address a detainee in such a dismissive and unprofessional

manner. Instead, a supervisor with a thorough understanding of the law and appropriate protocol would communicate clearly and respectfully, ensuring that all interactions adhere to legal standards and departmental policies.

## ROSE'S FALSE ACCUSATIONS

66. Plaintiff Wogan's Id was returned at 3:59 am and was told not to leave until the illegal substance left his body.

67. It should be noted that this search lasted forty-four minutes. At one point there were five officers searching through the contents of Mr. Wogan's car. The officers collectively looked through everything in the trunk and cabin of the car at least twice. They searched underneath the hood in the engine compartment and even got on their hands and needs and looked under the car.

68. At around 4 a.m., Defendant Rose transports Mrs. Wilkes to the city jail based on directions provided by Defendant Bridges.

69. Mrs. Wilkes is subsequently booked into jail with a $10,000 bond, facing misdemeanor charges related to possession of paraphernalia. Throughout the journey, Defendant Rose, without any special privileges, violates traffic laws multiple times. Notably, these infractions include speeding and failure to obey traffic signs. Meanwhile, Mrs. Wilkes remains handcuffed in the back seat, with doors that can only be opened from the outside.

## INVESTIGATORY REPORT - AUTHOR APRIL ROSE

**(Written portrayal vs. recorded evidence)**

70. Exhibit G, attached herein, contains the report of Officer Rose and her numerous and consistent false accounts made by a Law Enforcement Officer with a complete disregard for the truth. The follow accounts show the obvious discrepancies between her written account made under-oath and the video in which what really happened can be seen and heard.

## FIRST PARAGRAPH

71. The last three words that were wrote are, "slumped over asleep." By definition, slumped over is having your head low and your shoulders forward. Mr. Wogan was in an upright position, back against the seat and with his head forward, not "slumped over."

## *SECOND PARAGRAPH*

*72.* In her report, Defendant Rose stated in an uncertain manner, "I observed what appeared to be a wet spot on his shirt where it appeared he had been drooling and possibly sweating extensively."

## ROSE'S CONTRADICTIONS

73. At 2:49 a.m., Defendant Rose informed Defendant Bridges, "They were both passed out and he was drooling all over himself…so…I was thinking."

74. At 3:01:27 a.m., Defendant Rose further remarked, "I'm also with how passed out he was and drooling on himself. I don't know if he's good to be driving, like at this point."

75. In paragraph seventy-two, Defendant Rose used the words "appeared" twice and "possibly" in her written statement regarding Plaintiff Wogan's alleged drooling. However, in paragraphs seventy-three and seventy-four, Defendant Rose spoke of the drooling as an established fact, particularly in the context of suspected narcotics use. This inconsistency indicates that Defendant Rose's statement does not align with the recorded evidence. She spoke as though she had directly observed Plaintiff Wogan drooling, but her own report suggests she did not witness the drooling firsthand.

## THIRD PARAGRAPH

76. In the second sentence, Defendant Rose wrote, "Officers asked Wogan and Wilkes if there was anything illegal in the vehicle." Defendant Rose omitted the fact that she was the one that had the following conversation:

**Actual Conversation 2:50 a.m.**

> ***Rose***: *"Um, you guys have anything illegal in the vehicle"*
> ***Wogan***: *"No, mam."*
> ***Rose:*** *"Weapons?"*
> ***Wogan***: *"No, mam"*

***Rose***: *"Marijuana"*
***Wogan***: *"No, mam"*
***Rose:*** *"Heroin?"*
***Wogan***: *"No, mam"*
***Rose***: *"Cocaine?"*
***Wogan:*** *"Why would I have any of that? No mam."*

## FOURTH PARAGRAPH

77. In the first sentence, Defendant Rose wrote, "Wogan was asked to step out of the vehicle,"

78. At 2:52:07 a.m., Defendant Bridges says, "How about you hop out for a sec."

79. Wogan was not asked to step out. Wogan was told to hop out.

80. In the second sentence, Defendant Rose wrote, "As Wogan exited the vehicle I observed what I believed might be body tremors, possible caused by the use of narcotics." When Wogan exits the vehicle, the first step he takes, his right leg gives out a little and takes a couple limping steps afterwards obviously in pain.

81. Normal reactions to pain would include tremors, elevated heart rate among other things while the pain is present. Drug induced tremors are involuntary in nature, meaning you shake without trying to do so and can't stop when you try.

82. Defendant Rose made an assertion that Wogan had body tremors getting out of the vehicle but omits to say if Wogan had visible tremors during the whole encounter or just getting out of the vehicle. This "after the fact" thought was never verbally communicated to any other officer.

83. Defendant Rose fails to mention that Wogan suffers from Narcolepsy, a "neurological disease." If this were included in Rose's report, it would explain everything Rose

wrote in her report to this point, in which, Rose uses to falsely accuse Wogan of being on Narcotics.

84. Midway through the paragraph, Rose wrote, "Wilkes finally stated she was arrested for Possession of Methamphetamine. Wilkes would later admit to being a Methamphetamine user and her method of usage was by smoking it."

## ***ACTUAL CONVERSATION***

**Bridges:** *"What was your choice of use when you did it when you did use"*
**Wilkes** *"I've always preferred marijuana personally,"*
**Bridges** *"I'm talking about dope when you used dope"*
**Wilkes** *"I never really liked to use any of it"*
**Bridges** *"yeah, but did you eat it, snort it, shoot it, smoke it"*
**Wilkes** *"oh, oh, oh, I smoked it"*

85. The statement above in paragraph eight-four, Defendant Rose wrote objectional characterizations that should have never been used. Rose spoke to this event as if it happened in the first person when in fact, it's a hearsay statement. The entire conversation was between Bridges and Wilkes.

A. The word "finally" was used to say Wilkes had been asked numerous times. This did not happen

B. The insertion of "would later," was in fact, in the same eighteen seconds of questioning from Defendant Bridges with Wilkes, that completely took place away from Defendant Rose.

C. The use of the word "user," that within the context of the sentence, "user" would refer to Wilkes admitting to being a current user. Wilkes clearly did not

say this. Wilkes did not imply, at any point in time or in any way similar as depicted in these characterizations given by Defendant Rose.

86. In the last two sentences, Rose wrote "When I inquired about where they like to stay, Wogan said Casinos. Wogan began talking about traveling around to various casinos in different states."

## ACTUAL CONVERSATION

***Rose:*** *"You guys usually stay in hotels when you are out doing your door dash stuff?"*
***Wogan:*** *"Casino's"*
***Rose:*** *"hmmm?"*
***Wogan:*** *"Casino's"*
***Rose:*** *" oh, in casino's, alright. How long have you been on the road for?"*
***Wogan:*** *" a couple of weeks this time"*
***Rose:*** *"Did you head straight to Memphis, or did you make any other stops on the way up here?"*
***Wogan:*** *"On the way to Memphis, Philadelphia. I had my phone stolen and half the reason we came up here this time."*
***Rose:*** *"Philadelphia, Mississippi?"*
***Wogan:*** *"Bok homa"*
***Rose:*** *"hmmm?"*
***Wogan:*** *"Bok homa"*
***Rose:*** *"Bok homa"*
***Officer John Doe:*** *"He is talking about a casino."*
***Rose:*** *"I see, all right...so you guys like hitting up the casinos?"*
***Wogan:*** *"It is fine, better than the bar."*
***Officer John Doe:*** *"Win a lot?"*
***Wogan:*** *"Random"*
***Officer John Doe:*** *"Went in there one time, that was enough"*
***Wogan:*** *"Am I not free to leave?"*

87. Officer Rose states Wogan "began talking," when in fact Wogan did nothing more than make very brief and direct responses to Defendant Rose's and Officer John Doe's

questioning. Wogan then asks, "Am I free to leave?," twice, which quickly ended the conversation and Defendant Rose refused to answer.

88. Within the rulings of Miranda, any conversation that is volunteered cannot be suppressed. Defendant Rose by adding this statement shows two things:

A. Defendant Rose clearly forgot exactly when Wogan expressed that he was not wanting to answer any more questions

B. Defendant Rose clearly knew the law and added "began talking" in trying to say Wogan was volunteering this information.

**FIFTH PARAGRAPH**

89. In the fifth paragraph, second sentence: Rose wrote, " I asked Wogan if he would perform some tests. He agreed to do tests that did not require him to walk because his hip was hurting."

**TIMELINE OF EVENTS**

90. 2:44:07: Rose asks for ID's and doesn't return Wogan's ID until 3:59 a.m., Wilkes ID wasn't returned until the next morning when she was released from jail.

91. 2:54 a.m.: Wogan asks twice if he was free to leave and ignored.

92. 2:55 a.m.: Rose receives all clear on ID's and vehicle from dispatch and chooses to continue on "fishing expedition"

93. 2:57 a.m.: Wogan asks if he free to leave and being ignored for the third time asks, "Am I being detained or?" Bridges then says, "yeah"

94. 3:02 a.m.: Wogan requested a breathalyzer twice. Both requests were denied.

95. 3:03 a.m.: Rose states, "so you're not willing to do any test?" during the continued coercion of Rose and Bridges, stalling till the K9 arrived. Wogan answered the question by saying, "what? I don't care, I just wanna go."

96. Wogan inquired about his freedom to leave on four occasions, then questioning, "I want to know why I'm not free to leave," bringing the total to five times. Despite his persistence, these inquiries were consistently ignored until Bridges confirmed Wogan's detention. Wogan made seven requests to undergo a breathalyzer test, all of which were denied. Both Wogan and Wilkes' identification remained in Defendant Roses' possession. The officers deliberately avoided addressing these crucial questions posed by Mr. Wogan, which could have concluded the encounter. Wogan reluctantly complied with the officers' demands, expressing his refusal a total of eight times before ultimately being coerced into compliance.

97. Defendant Rose performed these test on Wogan knowing the following factors were present: (a) Narcolepsy, (b) pain in the hip area and also knowing(c) Wogan had just been woken up on a very hot day and night, and without fluids.

98. The following are parts of the participant training manual for Field Sobriety Test by the NHSTA.

A. **There should be a clear, distinguishable break between the check for Equal Tracking and Lack of Smooth Pursuit. **In the training manual, this is in bold print, showing importance****

B. The object must be moved steadily, at a speed that takes approximately two seconds to bring the eye from center to side

C. The stimulus must be moved in a smooth, continuous manner without stopping at either side or the center while checking for this clue.

99. Defendant Rose conducted the eye test for a total of three min and thirty seconds. With no break. The clear and distinguishable break that is emphasized in the manual was never given. Rose used her finger with the flashlight pointed directly in Wogan's eye, not providing a true background in contrast. When performing the test, the movement was neither smooth nor at the rate of speed and did not do so in a continuous manner without stopping.

## SIXTH PARAGRAPH

100. Defendant Rose wrote, "Officers also located several dozen cards with magnetic strips, some with Wogan's name and other that were generic with no name. A laptop, monitor, several external electronic data storage devices, and miscellaneous electronics were also located in the vehicle. Several ledgers containing money amounts and casino locations were also in Wogan's belongings."

101. Rose fails to mention that she called in all the electronics in the car, and they all came back either clean or in the Plaintiff's name. Mileage logs are required to have starting and ending mileage, time, destination and either personal or business use. Personal mileage still has to be recorded, hence the numbers she calls money amounts and casino locations. Wogan's fuel gauge also did not work at the time and kept a separate log of mileage and gas purchases to track the amount of fuel left in their vehicle.

## SECOND PAGE OF REPORT – FIRST PARAGRAPH

102. Last sentence, Rose states, "At the time of this report, Wilkes was scheduled to be released from RPD custody on July 26, 2021, at 0700 hours on her own recognizance."

103. Rose chose to leave out that Wilkes was booked with a $10,000 bond, issued by Defendant Rose.

104. MS Code 41-29-139(d) has the maximum penalty for paraphernalia being 6 months in county jail, $500 or both.

105. Miss. R. Crim. P. 8.2 guidelines and recommended bail for a misdemeanor with punishments state in (A) above: $250 to $1000.

106. Upon being booked into jail, the jailer changed this immediately and after the mandatory hold time of 7 hours was release with a notice to appear.

## SECOND PAGE – SECOND PARAGRAPH

107. Rose wrote, "Wogan was released, but he was advised to stay parked where he was and allow the controlled substance to leave his system before driving. It should be noted, Wogan's criminal history revealed numerous arrest for felony drug possession, manufacturing, trafficking, and fraudulent check charges."

## WOGAN'S CRIMINAL RECORD

108. 5/11/2001 – 6 counts of Worthless Check make utter issue, amounts: $77.13, $115.98, $174.88, $49.15, $35.95, $97.35.

109. 10/22/2014 – (all conspiracy charges) three counts drugs possess listed chemical, drug produce, traffic, drug equipment and after trial by jury, Wogan was found guilty of a lesser included charge of possession of controlled substance and drug equipment, Not Guilty of Drugs possess wit Manufacturing (three counts) and no file on drugs produce.

110. In Defendant Rose's publicly available report, she penned a statement that exhibited recklessness by incorporating baseless accusations as if they were established facts. This included posting the unfounded theory that Wogan was under the influence of a controlled substance and greatly exaggerating his criminal record, which, during the encounter, remained unknown. It is essential to note the distinction between the charges of "worthless" and "fraudulent," with the former constituting a misdemeanor and the latter a felony. Rose makes it sound like Wogan is a career criminal using the word 'numerous" which is very much an inaccurate statement. A background check on Plaintiff Wogan will only produce one felony arrest.

111. During the unlawful seizure, Defendant Rose was given plenty of objectional explanations. They were plausible and were the truth. Defendant Rose failed to accept any explanations as truth or include any objectional information such as,

A. Temperature outside (95 degrees was the high temperature on 7/25/2021, 86 degrees at time of stop)

B. Obvious grease stains and not drool on shirt,

C. Wogan's vehicle not having a/c being reason for traveling at night,

D. Wogan having Narcolepsy,

E. Pain located in hip

F. The bottle of fireball was bone dry. Did not have any other reason to suspect sobriety

G. The notebooks containing alleged money amounts being mileage logs

H. Why she was on private property and reasoning for approaching Wogan's vehicle.

There is no mention of Wilkes' ability to drive, and her sobriety was never questioned.

## COUNT I– DEFENDANT ROSE

## 42 U.S.C. § 1983– UNLAWFUL SEIZURE

## FOURTH AMENDMENT VIOLATION

112. The Plaintiff's incorporates all preceding paragraphs by reference as if fully rewritten and set herein.

113. The Plaintiff's hereby incorporates all Exhibits in their entirety as if fully referenced and set herein.

114. This claim arises from 42 U.S.C. § 1983, wherein the Plaintiff's seeks redress for the deprivation of Fourth Amendment Rights guaranteed by the United States Constitution, protecting against unreasonable searches and seizure.

115. Defendant Rose, throughout all relevant times herein, was acting under color of state law in her capacity as an officer of "RPD" through the "City."

116. On the morning of July 26, 2021, Defendant Rose, while conducting a "beat security check" of the privately-owned property of the Renaissance Mall (1000 Highland Colony Parkway, Ridgeland, MS 39157), initiated an investigatory stop on Plaintiff's Wogan and Wilkes without probable cause, reasonable suspicion, or evidence of any law or local ordinance being violated.

117. Defendant Rose, without asking about the well-being of either Plaintiff, parked her marked cruiser directly behind and activated her spotlight on the Plaintiff's car, thereby demonstrating authority, and identified herself as a police officer before immediately requesting identification. These actions did not constitute a consensual encounter but rather an investigatory stop from the outset.

118. The relevant open container law and city ordinance of Ridgeland, MS, pertains to an open container containing alcohol, being unlawful for the driver and/or passenger of a motor vehicle to possess , or any person on municipally owned property. However, Defendant Rose's actions are contested based on the specifics of the law and the private property status, in which, she clearly vocalizes during a conversation with Defendant Bridges.

119. Furthermore, Defendant Rose, in her investigatory report, does not outline her reasonable suspicion or probable cause for her initial contact.

120. The Plaintiff's assert that because a consensual encounter would be unreasonable due to the fact that waking someone one up would not be a normal start to a consensual conversation. There were no signs of distress or medical issue, or any other extenuating circumstances to think the Plaintiffs were violating any law. Defendant Rose never saw the Plaintiff's car in motion on any public roadway and in fact been in that parking spot for 2 hours and 40 minutes.

121. The Plaintiff's argue that Defendant Rose's actions were unjustified, considering the private property status, the absence of any sensory elements indicating alcohol consumption, and the civil nature of the violation.

122. The Plaintiffs argue that Defendant Rose lacked reasonable suspicion for initiating a DUI investigation and repeatedly denied Mr. Wogan's request for a breathalyzer, despite seven attempts. Defendant Rose's actions are alleged to have infringed upon the constitutional rights of Mr. Wogan and Mrs. Wilkes as guaranteed by the Fourth Amendment of the United States Constitution.

123. The Plaintiffs allege Defendant Rose knew or should have known that:

A. Making contact on private property without cause or justification was unlawful and unnecessary.

B. She was not performing duties under the community caretaking function.

C. No violations of the law justified the investigation or seizure.

D. Contact was unreasonable without a crime in progress, and waking someone up for a consensual encounter was not reasonable.

E. The seizure of the Plaintiff's was unreasonable, violating their right to be protected from unreasonable seizures under the Fourth Amendment.

124. As a direct and proximate result of Defendant Rose's unreasonable and unlawful actions, Plaintiffs Wogan and Wilkes were subjected to multiple constitutional violations. Plaintiffs Wogan and Wilkes have endured and continue to endure significant past and future damages, both compensatory and general, including expenses related to court appearances, diminished wages, lost employment opportunities due to failed background checks, and profound mental and emotional distress.

125. Due to Defendant Roses's actions, which are claimed to have involved "reckless or callous indifference" to the federally protected rights of Wogan and Wilkes, the Plaintiff's assert that an award of punitive damages is appropriate to the fullest extent permitted by law.

**COUNT II– DEFENDANTS ROSE AND BRIDGES**

**42 U.S.C. § 1983– UNLAWFUL EXTENDED SEIZURE**

**VIOLATION OF FOURTH AMENDMENT**

126. The Plaintiff's hereby incorporate all preceding paragraphs by reference, as if fully rewritten and set herein.

127. The Plaintiff's incorporate all Exhibits in their entirety, as if fully referenced and set herein.

128. The Plaintiffs allege Defendants Rose and Bridges, throughout all relevant times, were acting under color of state law in their capacities as employees of the "RPD."

129. The claim arises from 42 U.S.C. § 1983, wherein Plaintiff's Wogan and Wilkes seek redress for the deprivation of Fourth Amendment Rights guaranteed by the United States Constitution, protecting against unreasonable searches and seizures, stemming from Defendant Rose and Bridge's extended amount of time keeping Wogan and Wilkes detained waiting for K-9 to arrive, and throughout the search and arrest.

130. Defendant Rose initiated contact with Mr. Wogan, and significant time elapsed during various interactions, as detailed in subparagraphs A to KK below. Defendant Rose knocks on Mr. Wogan's window when 3 minutes and 16 seconds elapsed in video. Important time

periods to note with elapsed time are as follows: (all times include the initial elapsed time of 3m16s)

A. Asks for ID's – 4 min 9 sec
B. Rose asks how much of that fireball Mr. Wogan had – 4 min 53 sec (44 seconds later)
C. Rose, calls in ID's – 6 min 15 sec
D. Rose questions itinerary the entire time until Defendant Bridges arrives -- 8 min 38 sec
E. Bridges asks Wilkes, (can hear in Roses body mic), "What about you driving?" -10 min 15 sec
F. Rose asks Wogan about contents of vehicle -- 10 min 33 sec, (This was done through direction of Defendant Bridges)
G. Wogan was instructed to hop out of vehicle – 12 min 31 sec
H. Wogan asks if he is free to leave -- 15 min 2 sec.
I. Bridges articulates and Rose agrees there is " Not much to go off of" -16 min.
J. Wogan asks if he is free to go -- 16 min 51 sec.
K. Wogan asks if he is being detained -- 17 min 17 sec
L. Bridges tells Wogan he is being detained -- 17 min 19 sec
M. Wogan says " I'm not answering anymore questions" --17 min 32 sec
N. Phone call between Bridges and Johnson starts -- 17 min 51 sec
O. Bridges tells Johnson, "If you wanna come out, if not, we'll let them go" -- 18 min 46 sec
P. Bridges says travel is "kind of suspicious" - 21 min 09 sec

Q. Bridges instructs Rose on what to do while "waiting"- 21 min 29 sec.

R. Wogan tries to say no to field sobriety test (hereinafter "fst") and request a breathalyzer - 22 min 36 sec

S. Wogan again for second time tries to say no to fst and request a breathalyzer immediately- 22 min 48 sec

T. Wogan tries to say no to fst for third time - 22 min 51 sec

U. Wogan tries to say no for the fourth time to fst and third time asking for breathalyzer. - 22 min 59 sec

V. Wogan gives in and say's " I don't care, I don't care, I just wanna go" - 23 min 27 sec

W. Wogan asks for the fourth time for a breathalyzer. – 23 min 44 sec

X. Bridges says to Mrs. Wilkes, "had a little bit to drink, that's fine" – 24 min 23 sec

Y. Wogan ask twice, "You guys aren't extending this traffic stop waiting on a dog are you.?" - 28 min 1 sec

Z. Wogan says, after asking to do one more test, "Not if it's going to take five more minutes." (Fifth time saying no) - 28 min 25 sec.

AA. Wogan asks to do breathalyzer for sixth time. - 28 min 27 sec

BB. Wogan tries to say no for the sixth time. - 29 min 17 sec

CC. Wogan for seventh time, asks Defendants to give him a breathalyzer. 29 min 33 sec

DD. Wogan tries to say no again by saying, "what if I don't?" - (sixth time) 30 min 11 sec

EE. For the second time, Wogan tells Defendants " I'm not going to answer any more questions." - 30 min 51 sec

FF. Wogan says, " I want to know why I'm not free to leave." - 30 min 56 sec.

GG. Bridges says, "I don't think he's been using." - 31 min 2 seconds.

HH. Officer John Doe asks another officer how Rose came across them. - 31 min 35 sec

II. K9 is heard in the background barking - 32 min 31 seconds.

JJ. Wogan again verbally tells Defendants that it's been past 20 minutes, more than enough time for a Terry stop. Then Wogan says to Defendants, " I do not consent to the dog walking around my car." - 32 min 52 sec

KK. Bridges confirms he knows Terry v. Ohio, a well-established law.- 34 min 1 sec

131. Defendant Bridges, as a Police Sargeant with "RPD" is believed to have played a supervisory role during the incident.

132. Defendant Rose, according to her own admission, acknowledged the privately owned status of the mall parking lot. Her statement about the fireball bottle and questioning whether the property was private demonstrate knowledge of the law and suggest a "fishing expedition."

133. Defendant Bridges articulated doubts about the bases for the stop, acknowledging they "don't have much to go on." and "I don't think he has used."

134. Plaintiff Wogan inquiries about his freedom to leave were ignored, indicating malice and an intent to find something incriminating.

135. Plaintiff Wogan requested a breathalyzer seven times, refusing field sobriety tests an equal number of times.

136. Plaintiff Wilkes' sobriety and ability to drive were never questioned.

137. Defendants Rose and Bridges can be heard verbally indicating knowledge of clearly established laws and continued questioning for thirty-two minutes along with the field sobriety test in progress abruptly stopped when K-9 unit arrives.

138. Plaintiff Wogan mentioned the elapsed time, referring to Terry v. Ohio, indicating knowledge of case law, Defendants Rose and Bridges ignored and/or failed to apply this clearly established constitutional right.

139. Defendants Rose and Bridges actions were unlawful, unreasonable, and unjustified, violating clearly established law.

140. As a direct and proximate result of Defendants Rose and Bridges' unreasonable and unlawful actions, Plaintiffs Wogan and Wilkes were subjected to numerous constitutional violations. Plaintiffs Wogan and Wilkes have endured and continue to endure significant past and future damages, encompassing both compensatory and general losses such as expenses related to court appearances, diminished wages, missed employment opportunities due to failed background checks, and profound mental and emotional distress.

141. Due to Defendant Roses's and Defendant Bridges' actions, which are claimed to have involved "reckless or callous indifference" to the federally protected rights of Wogan and Wilkes, the Plaintiff's assert that an award of punitive damages is appropriate to the fullest extent permitted by law.

## COUNT III – DEFENDANT JOHNSON

## 42 U.S.C. § 1983– FALSE AFFIDAVIT USED TO SECURE PROBABLE CAUSE AND WARRANTLESS SEARCH OF VEHICLE - FOURTH AMENDMENT OF UNITED STATES CONSTITUTION UNREASONABLE SEARCHES

## COUNT IV – DEFENDANT JOHNSON

## 28 U.S.C. § 1367(a) - SUPPLEMENTAL JURISDICTION

## VIOATION OF STATE LAW § 97-9-59 – PERJURY

142. The Plaintiff's hereby incorporate all preceding paragraphs in their entirety by reference as if fully rewritten and set herein.

143. The Plaintiff's incorporate all Exhibits in their entirety, as if fully referenced and set herein.

144. Count III arises from 42 U.S.C. § 1983, wherein Plaintiff's Wogan and Wilkes seek redress for the deprivation of Fourth Amendment Rights guaranteed by the United States Constitution, protecting against unreasonable searches and seizures, alleging that Defendant Johnson utilized a false affidavit to secure probable cause, leading to a warrantless search of the vehicle.

145. Count IV invokes Title 28 U.S. Code § 1367(a) providing supplemental jurisdiction over a state law violation of perjury violating Mississippi State Law § 97-9-59.

146. The Plaintiffs allege that Defendant Johnson, throughout all relevant times, was acting under color of state law in his capacity as an employee of the "RPD."

147. On July 26, 2021, Defendant Johnson, walked his K-9 briefly on only the driver's side of the vehicle, the sole side not recorded by any of the dashcams., lasting approximately nine seconds.

148. Defendant Johnson's body mic audio, critical to understanding the events, was either omitted from provided video evidence or never activated during his duties on scene (which can allow audio cues to K-9 to go unheard.)

149. In Defendant Johnsons affidavit, he stated his K-9 showed a response at the driver's door seem, the Plaintiff asserts that the K-9 would not respond in this manner as Johnson would write.

150. Defendant Johnson had a conversation with Defendant Bridges expressing his expectations of them finding something and advising against searching Plaintiff Wilkes.

151. As a direct and proximate result of the Defendants' unreasonable and unlawful actions, both Plaintiffs Wogan and Wilkes were subjected to multiple constitutional violations, including the unlawful search of their vehicle. Plaintiffs Wogan and Wilkes have suffered and continue to suffer significant past and future damages, encompassing both compensatory and general losses such as expenses related to court appearances, diminished wages, missed employment opportunities due to failed background checks, as well as substantial mental and emotional distress.

152. Because Defendant Bridge's actions, "involved a reckless or callous indifference" to the federally protected right of Plaintiff Wogan and Plaintiff Wilkes, an award of punitive damages is appropriate to the fullest extent permitted by law.

## COUNT V – ALL DEFENDANTS

## 42 U.S.C. § 1983 – UNREASONABLE SEARCH

## VIOLATION OF FOURTH AMENDMANT

153. The Plaintiff's hereby incorporate all preceding paragraphs in their entirety by reference, as if fully rewritten and set herein.

154. The Plaintiff's also incorporate all exhibits in their entirety, as fully referenced and set herein.

155. This Claim arises from 42 U.S.C. § 1983, where the Plaintiff's seek to redress the violations of the Fourth Amendment of the United States Constitution committed by the Defendants Rose, Johnson, Bridges and S Doe while unlawfully searching the Plaintiff's vehicle, with unlawfully manufactured probable cause.

156. The Plaintiffs allege Defendants Rose, Bridges, Johnson, and S Doe at all times relevant to this action were acting under color of state law given to them through their employment by the City of Ridgeland Police Department.

157. Fourth Amendment states, "warrants should describe the place being searched and describe the things to be seized." The Defendants were reading through personal notebooks, that neither the notebooks nor words on the paper could contain narcotics.

158. Defendant Rose carried around both of the Plaintiff's cell phones trying to gain entry. Rose also called in all serial numbers that belonged to all the devices. These devices nor their status could contain narcotics,.

159. The Plaintiffs allege that the search was unlawful, and the Defendants knew or should have reasonably known they were violating clearly established law.

160. As a direct and proximate result of Defendants Rose, Bridges, Johnson, and S Doe's unreasonable and unlawful actions, Plaintiffs Wilkes and Wogan were subjected to numerous constitutional violations, including the unlawful search of their vehicle. Plaintiffs Wogan and Wilkes have endured and continue to endure substantial past and future damages, encompassing both compensatory and general losses such as expenses related to court appearances, diminished wages, missed employment opportunities due to failed background checks, as well as significant mental and emotional distress.

161. Because the Defendants actions, "involved a reckless or callous indifference" to the federally protected right of Wogan and Wilkes, an award of punitive damages is appropriate to the fullest extent permitted by law.

**COUNT VI – DEFENDANT ROSE**

**42 U.S.C. § 1983 – EQUAL PROTECTION AND DUE PROCESS**

**VIOLATION OF THE FOURTEENTH AMENDMANT**

**COUNT VII – DEFENDANT ROSE**

**28 U.S.C. § 1367– SUPPLEMENTAL JURISDICTION**

**Miss. Code Ann. S 99-3-7 - UNLAWFUL ARREST**

162. The Plaintiff hereby incorporate all preceding paragraphs in their entirety by reference, as if fully rewritten and set herein.

163. The Plaintiff also incorporate all exhibits in their entirety as fully referenced and set herein.

164. This claims arises under 42 U.S.C. § 1983 for violation of the Plaintiff's' Fourteenth Amendment Rights as well 28 U.S.C. § 1367, conferring jurisdiction upon the court to adjudicate actions stemming from the same complaint for violations of Miss. Code Ann. S 99-3-7, making an arrest not within the guidelines of this section. Plaintiff Wilkes seeks redress for alleged unlawful and criminal actions committed by Defendant Rose.

165. The Plaintiff alleges that Defendant Rose, throughout all relevant times acted under the color of state law by virtue of her employment with the "RPD."

166. Mississippi Statue 99-3-7 states:

> "An officer or private person may arrest any person without warrant, for an indictable offense committed, or any law enforcement officer may arrest any person on a misdemeanor charge without having a warrant in his possession when a warrant is in fact outstanding for that person's arrest and the officer has knowledge through official channels that the warrant is outstanding for that person's arrest', a breach of the peace threatened or attempted in his presence" and "Any law enforcement officer may arrest any person on a misdemeanor charge without having a warrant in his possession when a warrant is in fact outstanding for that person's arrest and the officer has knowledge through official channels that the warrant is outstanding for that person's arrest".

167. Defendant Rose, under direction from Defendant Bridges, places Plaintiff Wilkes under arrest for possession of paraphernalia, a misdemeanor, without an (a)outstanding warrant, (b)a breach or peace or (c) any indication that the Plaintiff was a threat to herself.

168. At. 3:59:18, Defendant Rose, says,"1 headquarters show Ms. Wilkes in custody for possession of paraphernalia.", showing that a misdemeanor charge was sole charge for Ms. Wilkes being in custody.

169. At 3:59:40, Plaintiff Wilkes states, "You can't just give me a written ticket or something for that?." Defendant Rose's answer was, "Since you are from out of state that's not

an option." Plaintiff then asks, "if I was from in state it would be an option?" Defendant Rose ignores the question and doesn't respond.

170. The Plaintiff asserts Defendant Rose violated Mrs. Wilkes' Fourteenth Amendment guaranteeing equal protection and due process of law.

171. The Plaintiff asserts that Defendant Rose, a State of Mississippi certified officer, knew or should have reasonably known she was violating clearly established law.

172. As a direct and proximate result of the Defendant's unreasonable and unlawful actions, Plaintiff Wilkes has endured and continues to endure significant past and future damages. These damages encompass both compensatory and general losses, including expenses related to attending court dates, diminished wages due to court appearances, missed job opportunities resulting from failed background checks, as well as profound mental and emotional distress.

173. Because Defendant Rose's actions, "involved a reckless or callous indifference" to the federally protected right of Plaintiff Wilkes, an award of punitive damages is appropriate to the fullest extent permitted by law.

**COUNT VIII – FAILURE TO INTERVIENE –**

**DEFENDANTS "S DOE," BRIDGES AND JOHNSON**

**FORTH AMENDMENT 42 U.S.C. § 1983**

174. The Plaintiff's hereby incorporate all preceding paragraphs in their entirety by reference, as if fully rewritten and herein

175. The Plaintiff's also incorporate all Exhibits, in their entirety as fully referenced and set herein.

176. This claim arises under 42 U.S.C. § 1983, where Plaintiffs seek redress for violations of the Fourth Amendment of the United States Constitution committed by Defendants Johnson, Bridges, and S Doe due to their failure to intervene in unlawful actions.

177. Plaintiffs allege that Defendants Johnson, Bridges, and S Doe, acting under color of state law as employees of the "RPD," through the "City" had a duty to intervene to prevent or stop constitutional violations

178. Plaintiffs assert specific instances where Defendants failed to intervene:

- Upon Defendant Bridges' arrival at the scene and during subsequent interactions with Defendant Rose.
- During a phone call between Defendant Johnson and Defendant Bridges, where discussions allegedly included improper procedures.
- When Defendant S Doe conducted interviews and accepted responses that did not follow proper procedures.

179. As a direct and proximate result of Defendants Bridges, Johnson, and S Doe's failure to intervene, Plaintiff's Wogan and Wilkes were subjected to additional constitutional violations .

180. The Plaintiff's assert that Defendants Bridges, Johnson, and S Doe knew or should have reasonably known that their failure to intervene would result in the violations of clearly establish law and constitutional rights.

181. As a direct and proximate result of the Defendants' unreasonable and unlawful actions, which included the supervision by "RPD" supervisors allowing the unlawful seizure to persist, Wogan and Wilkes have suffered and continue to suffer substantial past and future damages. These damages include but are not limited to the costs associated with attending court

dates, loss of wages due to court appearances, missed employment opportunities resulting from failed background checks, as well as significant mental and emotional distress.

182. Because Defendants Bridges, Johnson, and S Doe's actions "involved a reckless or callous indifference" to federally protected rights of Plaintiff Wogan and Wilkes, an award of punitive damages is appropriate to the fullest extent of the law.

**COUNT IX– DEFENDANT ROSE**

**42 U.S.C. § 1983– FALSE AFFIDAVIT - FOURTH AMENDMENT VIOLATION**

**UNREASONABLE SEARCH AND SEIZURE**

**COUNT X – DEFENDANT ROSE**

**TITLE 28 U.S.C. § 1367(a) – SUPPLEMENTAL JURISTDICTION**

**MISSISSIPPI STATE LAW § 97-9-61 – PERJURY**

183. The Plaintiff's hereby incorporate all preceding paragraphs in their entirety by reference, as if fully rewritten and herein .

184. The Plaintiff's hereby incorporates all exhibits in their entirety as if fully referenced herein.

185. This Claim arises from 42 U.S.C. § 1983, where the Plaintiff's seek to redress the violations of the Fourth Amendment of the United States Constitution committed by the Defendants Rose by submitting a false sworn statement that sustained the unreasonable search and seizure.

186. Defendant Rose, acting under color of law, intentionally submitted a misleading and false investigatory report for events that took place on the morning of July 26, 2021, distorting critical details about Plaintiff Wogan's physical condition, actions, and statements during the encounter.

187. The false report, as outlined in Defendant Rose's documentation, infringed upon Plaintiff's' Fourth Amendment rights under the United States Constitution.

188. Defendant Rose's intentional misrepresentations in the report directly contributed to the extended detention of Plaintiff's, resulting in the arrest of Mrs. Wilkes, and causing consequential emotional distress, reputational harm, and economic losses.

189. Defendant Rose, while under oath, knowingly and deliberately made false statements in her investigatory report, particularly regarding Plaintiff Wogan's physical condition, actions, and statements.

190. Defendant Rose's perjury constitutes a violation of the state perjury statute § 97-9-61, prohibiting the deliberate provision of false information under oath.

191. As a direct and proximate result of Defendant Rose's unreasonable and unlawful actions, Plaintiff Wilkes has endured and continues to face significant past and future damages, encompassing expenses related to attending court dates, lost wages associated with those court appearances, missed employment opportunities due to failed background checks, as well as enduring mental and emotional distress.

192. Defendant Rose abused legal procedures for improper motives, causing harm to Plaintiffs. Given that Defendant Rose's actions demonstrated "reckless or callous indifference" to Plaintiff Wilkes' federally protected rights, an award of punitive damages is warranted to the fullest extent allowed by law.

**COUNT XI– DEFENDANT ROSE**

**RECKLESS ENDAGERMENT AND DISREGUARD FOR SAFTEY**

**28 U.S.C. § 1367 (a)– SUPPLEMENTAL JURISDICTION**

**VIOLATION OF MISSISSIPPI STATE AND LOCAL TRAFFIC LAWS**

193. The Plaintiff's hereby incorporate, by reference, all preceding paragraphs in their entirety, as if fully rewritten herein.

194. The Plaintiff's hereby incorporates all exhibits in their entirety as if fully referenced herein..

195. This claim arises under 28 U.S.C. § 1367(a), granting this court the authority to adjudicate matters pertaining to Mississippi State and Local laws concerning the failure to obey traffic devices and reckless endangerment. In this context, Plaintiff Wilkes seeks redress for these violations.

196. The Plaintiff's contends that Defendant Rose did not assume any special privilege in transporting Plaintiff Wilkes to the city jail.

197. Additionally, the Plaintiff's asserts that Defendant Rose knew or should have reasonably known that her actions could have left Plaintiff Wilkes in a vulnerable situation, while simultaneously violating clearly established laws prominently displayed on visible traffic signs.

198. Defendant Rose, in a reckless disregard for safety and human life, committed two counts of speeding, recorded at 10 mph over the posted speed limit. Furthermore, she violated traffic regulations by running two separate stop signs while executing left-hand turns at speeds greater than one would use for a rolling stop.

199. The Plaintiff's maintains that Defendant Rose's actions during these traffic violations exhibited a wanton indifference to the safety and well-being of Mrs. Wilkes.

200. As a direct and proximate result of Defendant Rose's reckless driving, Plaintiff Wilkes suffered additional distress and harm during their unlawful seizure and arrest, an award of punitive damages is appropriate to the fullest extent of the law.

## COUNT XII – ALL DEFENDANTS

## DEPRIVATION OF RIGHTS UNDER COLOR OF LAW - 18 U.S.C. § 242

201. The Plaintiff's incorporate all preceding paragraphs, as fully referenced and rewritten herein.

202. The Plaintiff's incorporate all Exhibits, in their entirety as fully referenced and set herein.

203. This claim arises under 18 U.S.C. § 241, with Plaintiff's seeking redress for the alleged deprivation of constitutional rights.

204. The Plaintiffs allege that Defendants Rose, Bridges, Johnson, and S Doe, are certified and sworn officers of the State of Mississippi, were knowledgeable about and understood their official duties, the laws they enforce, as well as civil rights, state, and local laws they are required to follow.

205. The Plaintiffs allege that at all relevant times, Defendants Rose, Bridges, Johnson, and S Doe were acting under color of state law through their employment with the "RPD" through the "City."

206. As a direct consequence of the defendants' unreasonable and unlawful conduct, Plaintiffs Wogan and Wilkes have allegedly experienced multiple constitutional violations. They continue to endure significant past and future damages, encompassing expenses related to court appearances, lost wages, prospective job opportunities hindered by failed background checks, and deliberate mental and emotional distress.

207. Due to the alleged actions of the Defendants involving "reckless or callous indifference to the federally protected rights of Wogan and Wilkes," an award of punitive damages is appropriate to the fullest extent permitted by law.

208. The Plaintiffs allege that the Defendants' actions willfully and purposefully deprived them of their constitutional rights under the color of law. Sanctions on Defendants are appropriate to the fullest extent permitted by law.

## COUNT XIII

## DEFENDANTS ROSE, BRIDGES AND JOHNSON

## CONSPIRACY AGAINST RIGHTS – 18 U.S.C. § 241

209. The Plaintiff's incorporates all preceding paragraphs, by reference as if fully rewritten and set herein.

210. The Plaintiff's hereby incorporates, all Exhibits, in their entirety as if fully referenced and set herein.

211. This claim arises from 18 U.S.C. § 241, where the Plaintiff's seek to redress the violations committed by Defendants Rose, Bridges and Johnson, who willfully and purposefully conspired together to violate the right's bestowed upon the Plaintiff's by the United States Constitution.

212. The Plaintiff's assert that the Defendants Rose, Bridges and Johnson knew or should have known that their actions violated clearly established law.

213. The Plaintiffs allege that Defendants Bridges and Rose conspired together, with Bridges instructing Rose as what to do while they are waiting and then Defendant Rose carrying out the above-mentioned instructions. Defendants Rose and Bridges actions violated the protections of the Fourth Amendment guaranteeing the Plaintiff's protection from unreasonable search and seizures.

214. The Plaintiffs allege that Defendant Johnson conspired with Defendant Bridges to unlawfully justify the lack of findings during the search of their vehicle. After several minutes of failing to locate any illegal substances, Defendant Johnson speculated that Mrs. Wilkes might have concealed contraband on her person. He posited that the K-9 alert could have been triggered by this potential concealment, and that failing to search Mrs. Wilkes would leave this possibility unaddressed, thereby rendering the alert theoretically plausible. These actions constitute a violation of 18 U.S.C. § 241, as Defendants Rose, Bridges, and Johnson willfully and purposefully conspired together to infringe upon the rights bestowed upon the Plaintiffs by the United States Constitution, leading to further Fourth Amendment violations.

215. As a direct and proximate result of the Defendants unreasonable and unlawful actions, Plaintiff's Wogan and Wilkes were subjected to several constitutional violations. Plaintiff's Wogan and Wilkes have suffered and continue to suffer substantial past and future damages, both compensatory and general, including but not limited to, the cost of travel to court dates, loss of wages in conjunction with court dates and future job opportunities impacted by failed background checks, including intentional mental and emotional distress.

216. Due to the purported actions of Defendants Rose, Bridges and Johnson, which are to have involved "reckless and callous indifference to the federally protected rights of Wogan and Wilkes," the Plaintiff's contend that an award of punitive damages is appropriate to the fullest extent of the law.

## COUNT XIV

## MONELL CLAIM AGAINST THE CITY OF RIDGELAND

### SECTION 1 – CLAIM

217. The Plaintiff's incorporate all preceding paragraphs, by reference fully rewritten and set herein.

218. The Plaintiff's also incorporate all exhibits in their entirety as fully referenced and set herein.

219. This claim is asserted under Monell v. Department of Social Services, 436 U.S. 658 (1978), holding that a local government may be sued for monetary, declaratory, or injunctive relief where the local government itself, through a policy or custom, causes a constitutional violation.

220. The City of Ridgeland, as the employer of Defendants Rose, Bridges, Johnson, and Supervisor John Doe, are vicariously liable for their actions taken under color of state law in their official capacities.

221. The Plaintiffs contend that the City of Ridgeland, through its policies, procedures, and customs, created an environment that tolerated and condoned the unconstitutional actions of its employees.

222. The City of Ridgeland, through its failure to adequately train, supervise, and discipline its police officers, exhibited deliberate indifference to the constitutional rights of individuals within its jurisdiction.

223. The Plaintiff's assert that the City of Ridgeland's policies, customs, and practices were a direct and proximate cause of the violations of the Plaintiff's' constitutional rights as alleged in this complaint.

224. The Plaintiff's further argue that the City of Ridgeland knew or should have known that its failure to address and correct the systemic issues within its police department would result in the violations of clearly established law and constitutional rights.

225. As a result of the City of Ridgeland's deliberate indifference, Plaintiff's Wogan and Wilkes were subjected to constitutional violations, and their rights were violated under the Fourth and Fourteenth Amendments of the United States Constitution.

226. The Plaintiffs seek damages, both compensatory and punitive, as well as any other relief deemed just and proper by the court.

227. The Plaintiff's assert that the City of Ridgeland is liable for the unconstitutional actions of its employees under the principles established in Monell.

228. Due to the unconstitutional policies, customs, and practices of the City of Ridgeland, the Plaintiff's seek a declaration from the court, finding the City of Ridgeland liable for the constitutional violations alleged herein, and injunctive relief to prompt corrective action by the City of Ridgeland to prevent future violations of constitutional rights by its police officers.

**SECTION TWO – EXHIBIT D**

229. The Plaintiff's submit Exhibit D, a paper authored by several Georgia Law students in May 2018, documenting their observations in various courtrooms, including Ridgeland, MS. in 2017.

230. The Plaintiff's argue that this paper serves as compelling testimony regarding ongoing civil rights violations within courtrooms and highlights a lack of accountability for officers, especially in cases overseen by Prosecutor Boty McDonald.

231. The Plaintiffs contend that the observations made by the students reveal a pattern of civil rights violations committed by Prosecutor McDonald, indicating a lack of oversight and accountability within the City of Ridgeland.

232. The Plaintiff's assert that this evidence further supports the claim that the City of Ridgeland, through its policies and practices, created an environment where civil rights violations are tolerated and condoned.

**SECTION THREE – EXHIBIT E – SECTION ONE**

233. The Plaintiff's submit Exhibit E – Section One, which includes cases revealing the failure of City Prosecutor Boty McDonald to properly handle appeals involving police misconduct, specifically cases related to Officer Daniel Soto.

- ***Drabicki v. City of Ridgeland No. 2012-KM-00529-COA 2014-01-14***

  No brief was filed by the city many times

  Boty McDonald was counsel for the city in this case.

- ***Webber v. State No. 2014–KM–01800–COA. 08-09-2016***

City Prosecutor Boty McDonald failed to file an appellee's brief, a recurring issue in appeals from the City of Ridgeland.

***¶13. However, in light of the consistent failure of the City of Ridgeland to participate in the proper judicial process, we have determined that the City of Ridgeland or its legal counsel has determined that it has no responsibility to prosecute cases before the appellate courts of Mississippi. We recognize the principle this Court may not automatically reverse five the judgment simply based on the City's neglectful and disrespectful failure to file a brief. However, as the Supreme Court considered this circumstance in Norman and this Court provided the City of Ridgeland and its counsel with similar notice in the February 4, 2016, order, we have determined that the City of Ridgeland's failure to file a brief on appeal is an intentional and meaningful act that is indeed tantamount to confession of the errors alleged by the appellant. We therefore reverse and render the judgment entered against Webber."***

- ***Norman v. State No. 2014-KM-01789-SCT 01-20-2016***

***"The Court ordered McDonald and the Attorney General's Office to appear for a show-cause hearing on November 9, 2015. That hearing was held; afterward, the Court ordered McDonald to file a brief within ten days setting forth the City's position" Norman v. State, No. 2014-KM-01789-SCT, 2 (Miss. Jan. 20, 2016)***

**"On November 22, 2015, McDonald filed a two-page "Confession of Appellant's Brief." On behalf of the city, McDonald confessed Norman's brief and asked this Court to reverse Norman's conviction."** ***Norman v. State*****, No. 2014-KM-01789-SCT, 2 (Miss. Jan. 20, 2016)**

- ***Lobo v. City of Ridgeland No. 2012–KM–00525–COA. 2013-05-28***

***"The record shows the City's counsel received the fourteen-day deficiency notice and did nothing. It was only after the threat of sanctions, two more sua sponte orders, and over two months having passed that the City filed its brief on January 31, 2012. That clearly fell outside the fourteen-day deadline required to correct a deficiency under Rule 2(a)(2), which the circuit court had issued to the City."*****Lobo v. City of Ridgeland, 135 So. 3d 148, 155-56 (Miss. Ct. App. 2013)**

- ***Robinette v. State No. 2014–KM–01649–COA. 11-17-2015***

  Another case where City Prosecutor Boty McDonald failed to file an appellee's brief.

- ***Nolan v. State No. 2014–KM–01647–COA. 01-12-2016***

  McDonald's recurring failure to file an appellee's brief is noted.

- ***Cameron v. State, 175 So.3d 574, 577 n. 2 (Miss.Ct.App.2015)***
- ***Woods v. State, 175 So.3d 579, 580 (¶ 9) (Miss.Ct.App.2015)***
- ***Clack v. City of Ridgeland, 139 So.3d 778, 778 (¶ 1) (Miss.Ct.App.2014)***
- ***Carlson v. City of Ridgeland, 131 So.3d 1220, 1222 (¶ 8) (Miss.Ct.App.2013)***

**SECTION FOUR– OFFICER DANIEL SOTO**

**EXHIBIT E – SECTION TWO**

234. The Plaintiff's submit Exhibit E – Section Two, evidence detailing Officer Daniel Soto's perjury in a DUI case and subsequent resignation.

235. Soto's actions led to a new trial, where the court found he had given false testimony, resulting in the reversal of convictions.

236. Soto resigned from the Ridgeland Police Department and later faced similar allegations in another state, resigning again after a TBI probe.

237. The Plaintiff's argue that Soto's actions, supported by the city leaders' failure to hold him accountable, set a standard for police conduct that allowed the events of July 26, 2021, to unfold without consequences.

238. The City's decision not to address Soto's misconduct enabled him to repeat similar actions in another state.

239. The actions of City leaders, past and present, exemplify the lack of integrity within the City's Police Department and its unwillingness to serve the public.

240. The Plaintiffs contend that City leaders' failure to hold Soto accountable contributed to the officers' actions on July 26, 2021, revealing a pattern of misconduct and disregard for constitutional rights.

241. Former Officer Soto, set a standard that one could and may assume, that this conduct is acceptable with minimal persecution if in fact, these actions were to come into question. Officers can see from many instances if cases do come up on appeal, the city prosecutor , will purposely and willfully not file a case brief as ordered by the court, knowing that the court would have to give opinion based on original trial, furthermore, protecting the officers from having to answer for alleged actions.

242. Daniel Soto's actions should have come with consequences. The City of Ridgeland, and the actions of the city leaders, such as the Mayor, Chief of Police and Prosecuting Attorney, allowed all the before mention events to happen, to go unpunished and in unspoken words, business as usual. The inability and the unwillingness of such actions shows the lack of integrity of this Department and the City and the want to serve the public.

243. The City's decision not to hold Soto accountable allowed Soto to go to another state and use the same tactics to become officer of the year not once, but twice, in another state.

244. The actions of the leaders past and present are ever so apparent in the actions of the officers on July 26, 2021, with the following being several examples

- Defendant Rose in a false report.

- Defendant Johnson's unlawful affidavit of positive alert.
- Defendant Bridges as a supervisor allowing and conspiring to these actions.
- Defendant Supervisor John Doe defending and permitting these alleged violations.

245. The attached Exhibit C provides concrete instances demonstrating that the City not only condones but actively promotes the practice of police patrols in private businesses without explicit permission. According to RidgelandMS.org, "Sworn officers patrol businesses and neighborhoods and answer calls for service," suggesting a systemic approach to patrolling areas that may include private properties. This practice, endorsed by the City's official communications, raises concerns under the Fourth Amendment, which protects against unreasonable searches and seizures. Under established legal principles, police officers may patrol public areas, observe from public vantage points, respond to calls for service, and enter in exigent circumstances without explicit permission. However, they are generally prohibited from entering private property or conducting searches without the owner's consent, a valid search warrant, or exigent circumstances. The emphasis on "encouraging and supporting risk-taking" within the City of Ridgeland's Mission Statement further underscores a broader institutional attitude that potentially supports overreaching police activities. By promoting such practices and integrating them into their operational framework, the City of Ridgeland may be implicated in policies that encourage or facilitate constitutional violations. This alignment of official policy and practice supports the Monell claim by demonstrating that the City's endorsement and promotion of such actions constitute a de facto policy that fosters violations of constitutional rights.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff's respectfully request judgment against the City of Ridgeland, seeking appropriate relief to redress the alleged violations, including but not limited to compensatory, general, and punitive damages, a declaration of liability, injunctive relief, and any other relief deemed just and proper by the court. The Plaintiff's also specifically pray for the following:

i. Plaintiffs re-allege and incorporate by reference all preceding paragraphs and exhibits in this complaint as if fully rewritten or displayed herein.

ii. Trial by jury on all issues so triable.

iii. A declaration that Defendants Rose, Bridges, Johnson, and S Doe's actions, taken in their official capacities as alleged in respective counts above, violate the Fourth Amendment of the United States Constitution.

iv. A declaration that Defendants Rose, Bridges, Johnson, and S Doe's actions taken in their individual capacities, as alleged in respective counts above, violate the Fourth Amendment of the United States Constitution.

v. A declaration that Defendants Rose, Bridges, Johnson, and S Doe's actions were undertaken under color of state law in all respective counts, with penalties imposed as the court deems fit in accordance with Title 18 U.S.C. § 242.

vi. A declaration that Defendants Rose, Bridges, and Johnson conspired to deprive Plaintiffs of their civil rights in alleged Count IX, with penalties imposed as the court deems fit in accordance with Title 18 U.S.C. § 241.

vii. General damages in the amount of $750,000 for intentional mental and emotional distress suffered by Plaintiffs as a direct and proximate result of Defendants' actions.

viii. Compensatory damages in the amount of $200,000 for past and future financial losses, including but not limited to the cost of travel to court dates, loss of wages in conjunction with court dates, and any impact on future job opportunities as a result of failed background checks.

ix. Punitive damages in the amount of $3,000,000 against all Defendants to the fullest extent permitted by law, due to their alleged "reckless or callous indifference" to Plaintiffs' federally protected rights.

x. Pre-judgment and post-judgment interest.

xi. Immediate sanctions against Defendant Rose and Defendant Johnson for the criminal actions of perjury, with penalties imposed as the court deems fit.

xii. Immediate termination of Defendant Ben Johnson and Defendant April Rose, without severance, or, in the alternative, a mandated hearing on their state certification.

xiii. Immediate sanctions against Defendant Rose for speeding and two counts of failure to obey a traffic device with a reckless disregard for safety and human life.

xiv. An order to the Defendant, City of Ridgeland, to adopt and implement procedures and policies, training, accountability systems, and practices to remedy the constitutional and statutory violations described herein.

xv. Such other specific and general relief may become apparent from discovery as this matter matures for trial.

xvi. Any other relief the court deems just and proper in the circumstances

RESPECTIVALY SUBMITTED,

TERRENCE LEE WOGAN II

PRO-SE PLAINTIFF

3333 KEATING RD. PENSACOLA, FL 32504

(504)535-4735, 850-293-8187

TWOGAN341@GMAIL.COM

HEATHER LEE WILKES

PRO-SE PLAINTIFF

3333 KEATING RD. PENSACOLA, FL 32504

(850)400-3950