UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


TERRENCE LEE WOGAN AND
HEATHER LEE WILKES                                    PLAINTIFFS

VS.                          CIVIL ACTION NO. 3:24-CV-431-TSL-RPM

CITY OF RIDGELAND, MISSISSIPPI;
OFFICERS APRIL ROSE; HUNTER
BRIDGES; BEN JOHNSON, AND
SUPERVISOR JOHN DOE                                  DEFENDANTS

MEMORANDUM OPINION AND ORDER

Pro se plaintiffs Terrence Lee Wogan and Heather Lee Wilkes

filed this action asserting claims under federal and state law

relating to what they allege was their illegal detention by

Ridgeland police officers April Rose and Hunter Bridges, an

illegal search of their vehicle and belongings by Rose, Bridges

and K-9 officer Ben Johnson and the resulting illegal arrest of

Wilkes for possession of drug paraphernalia found during the

illegal search.  The case is presently before the court on the

motion of defendants City of Ridgeland, Rose, Bridges and

Johnson for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.  Plaintiffs have responded

in opposition to the motion, and the court, having considered

the memoranda of authorities and complaint with pertinent

exhibits, concludes that the motion should be granted except as

to plaintiffs' claims against defendants Rose and Bridges for

1

alleged unlawful search and seizure and against Johnson for alleged unlawful search, in violation of their rights under the Fourth Amendment.

Rule 12(c) Standard

To survive a Rule 12(c) motion for judgment on the pleadings, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[1] Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible when a plaintiff pleads facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[R]ecitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

In considering a motion to dismiss, the court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." Toy v. Holder, 714 F.3d 881, 883 (5th Cir. 2013). Pro se complaints are liberally construed, but "conclusory allegations or legal

---

[1]   A 12(c) motion for judgment on the pleadings "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008).

conclusions masquerading as factual conclusions will not suffice to state a claim for relief." Sanders v. Gibson, No. 23-11196, 2025 WL 1029440, at *2 (5th Cir. Apr. 7, 2025) (quoting Coleman v. Lincoln Par. Det. Ctr., 858 F.3d 307, 309 (5th Cir. 2017)).

"Generally, a court ruling on a motion to dismiss 'may rely only on the complaint and its proper attachments.'" Marchman v. Crawford, 726 Fed. Appx. 978, 984 (5th Cir. 2018) (quoting Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006)). "But a court may rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). In this case, plaintiffs have attached to their complaint several documents and exhibits, including most pertinently, a link to dashcam/bodycam footage of the encounter at issue. With their response, defendants have provided the same footage, in DVD form, which the court has viewed and considered in ruling on the present motion. See Gonzales v. McDonald, Civ. Action No. 1:23-CV-227-MJT-CLS, 2024 WL 3729104, at *3 (E.D. Tex. June 12, 2024)(holding that Fifth Circuit precedent permitted court's consideration of body camera and dashcam footage incorporated in plaintiff's complaint in ruling on motion to dismiss).

Qualified Immunity

In their motion, defendants Rose, Bridges and Johnson, in their individual capacities, have raised the defense of qualified immunity.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012).  When, as here, the defense of qualified immunity is asserted in a motion to dismiss, "the court has an 'obligation ... to carefully scrutinize [the complaint] before subjecting public officials to the burdens of broad-reaching discovery.'"  Longoria v. San Benito Indep. Consol. Sch. Dist., 942 F.3d 258, 263–64 (5th Cir. 2019) (quoting Jacquez v. Procunier, 801 F.2d 789, 791 (5th Cir. 1986)).  To overcome the immunity defense, the complaint "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm ... alleged and that defeat a qualified immunity defense with equal specificity."  Arnold v. Williams, 979 F.3d 262, 267 (5th Cir. 2020) (quoting Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012)).

A state official sued in his individual capacity for money damages is entitled to qualified immunity unless the plaintiffs' allegations demonstrate both that "(1) the official violated a

4

statutory or constitutional right, and (2) the right was 'clearly established' at the time." Benfield v. Magee, 945 F.3d 333, 337 (5th Cir. 2019).  To show clearly established law, she can either (A) identify caselaw which establish beyond debate that the officer's conduct violated then-clearly established law, Baldwin v. Dorsey, 964 F.3d 320, 326 (5th Cir. 2020), or (B) she can satisfy the obvious-case exception, Henderson v. Harris Cnty., Texas, 51 F.4th 125, 132 (5th Cir. 2022).  The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first.  Reichle, 566 U.S. at 664, 132 S. Ct. 2088.

PLAINTIFFS' SECTION 1983 CLAIMS

Both plaintiffs have both sued under 42 U.S.C. § 1983 for alleged violations of their Fourth Amendment rights.  Wilkes has also asserted § 1983 claims for violation of her Fourteenth Amendment due process and equal protection rights.  Section 1983 provides a cause of action against state actors who violate an individual's rights guaranteed under federal law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, plaintiffs must plead and prove that a person acting under color of law deprived them of a right secured by the Constitution or laws of the United States. Doe v. Columbia-Brazoria Indep. Sch. Dist. by & through Bd. of Trs., 855 F.3d 681, 687–88 (5th Cir. 2017).  Defendants insist that plaintiffs have failed to adequately allege facts

demonstrating that any defendant violated their constitutional rights.  They contend that plaintiffs' claims must be dismissed for this reason and others, including that the individual defendants have qualified immunity in their individual capacities, and that under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the City of Ridgeland has no potential liability.

Plaintiffs have alleged the following basic facts.  On the night of July 25, 2021, Wogan and Wilkes, his wife, were traveling from Memphis, Tennessee to Vicksburg, Mississippi via I-55 South.  Around midnight, Wogan took the Old Agency Road exit in Ridgeland and pulled into the parking lot of the Renaissance shopping center, just off the exit.  Wilkes was asleep in the passenger seat and Wogan was falling asleep while driving.  Wogan parked under a streetlamp near the Fresh Market store, closed his eyes and fell asleep.

At 2:38 a.m., while conducting a beat security check of the Renaissance premises, Ridgeland police officer April Rose noticed the couple's vehicle and pulled in behind it.  She exited her patrol car, approached the vehicle and, shining a flashlight through the window, observed Wogan and Wilkes, both sound asleep.  After a couple of minutes, Rose tapped on the rear driver's side window, rousing Wilkes, who shook Wogan to

wake him.  Rose identified herself as a Ridgeland police officer and said she was "just getting up with [them]" because "businesses [were] closed."  Wogan responded that he had pulled off the interstate because he was starting to fall asleep.  Rose asked where they were coming from; Wogan said Memphis and added that they were from Pensacola.  She asked where they were headed, and Wogan said Vicksburg.  Rose asked if they had their identifications on them and both handed their driver's licenses to her.

As she was talking with them, Rose noticed an empty Fireball Whiskey bottle on the backseat and asked Wogan, "How much of that Fireball have you had tonight?"  Wogan responded, "None."  And thus began the encounter that came to include six officers, including a K-9 handler and his drug sniffing dog, and culminated, some thirty to forty minutes later, in a search of plaintiffs' vehicle and belongings and the arrest of Wilkes for possession of drug paraphernalia, all of which led to plaintiffs' filing of the present lawsuit.[2]

---

[2]    More detail regarding plaintiffs' factual allegations is provided in the court's discussion of the specific claims and issues.

Fourth Amendment Unlawful Seizure:

Count I (Rose) & Count II (Rose and Bridges)

The Fourth Amendment guarantees individuals the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  For purposes of Fourth Amendment analysis, the Fifth Circuit has recognized three types of encounters between law enforcement officers and citizens.  The first is a consensual encounter during which an individual voluntarily agrees to communicate with the police.  Such encounters involve "'no coercion or detention and [do] not implicate the fourth amendment.'"  United States v. Massi, 761 F.3d 512, 520 (5th Cir. 2014) (quoting United States v. Zukas, 843 F.2d 179, 181 (1988)).  The second, a limited investigatory stop, known as a Terry stop, "'is a brief seizure that must be supported by reasonable suspicion....'"  Id. (quoting Zukas, 843 F.2d at 181).  "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person'" of criminal activity.  United States v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 541, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985)).  The third type of encounter is "'a full scale arrest [which] must be supported by probable cause.'"  Id. (quoting Zukas, 843 F.2d at 181-82).

The focus of plaintiffs' claim in Count I is on Rose's initial contact with them as they were asleep in their car in the Renaissance parking lot.  Plaintiffs allege that this initial encounter with Rose was not consensual but rather constituted a "seizure" because "[m]aking contact on private property without cause or justification was unlawful and unnecessary."  In other words, they claim this was an investigatory stop from the outset, unsupported by reasonable suspicion or probable cause to believe that they were committing any crime, and that therefore, this seizure violated their rights under the Fourth Amendment.  Plaintiffs' allegations in this regard do not state a viable claim for relief.

"[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... [and] ask to examine the individual's identification ... as long as the police do not convey a message that compliance with their request is required."  Florida v. Bostick, 501 U.S. 429, 435, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (citations omitted)).  "[A] consensual encounter .... may be initiated by the police without any objective level of suspicion."  United States v. Cooper, 43 F.3d 140, 145 (5th Cir. 1995).  See also United States v. Drayton, 536 U.S. 194, 197, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002) ("The Fourth Amendment permits police officers to approach [individuals] at random to

ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." (citing <u>Bostick</u>)).  An "encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature."  <u>Bostick</u>, 501 U.S. at 434, 111 S. Ct. 2382.

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  <u>Id.</u> at 439, 111 S. Ct. 2382.  Any number of factors can inform this determination, including "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled."  <u>United States v. Mask</u>, 330 F.3d 330, 337 (5th Cir. 2003) (citing <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980)).

Plaintiffs' factual allegations do not support their conclusory charge that the initial encounter between them and Officer Rose constituted a <u>Terry</u> stop.[3]  Rose, who was alone,

---

[3]    In light of defendants' contention that Rose had reasonable suspicion to approach and engage with plaintiffs based on the

initially did nothing more than approach plaintiffs' vehicle, wake them by tapping on the window, tell them she was "getting up with them" because the businesses were closed and ask them a couple of non-threatening questions about their itinerary and ask their identifications.  Nothing about her conduct would have indicated to a reasonable person that he or she was not free to decline to speak with Rose or otherwise end the encounter. Rose's actions, as identified by plaintiffs, plainly did not amount to a seizure, and plaintiffs' claim to the contrary is unfounded.[4]  See United States v. Jenson, 462 F.3d 399, 403-04 (5th Cir. 2006) (it is "plainly permissible" for an officer to "ask for driver's license and registration of the occupants and

---

fact that they were asleep in their car in the mall parking lot in the middle of the night and defendants' failure to suggest that the encounter was consensual, defendants appear to accept as true plaintiffs' allegation that Rose's initial approach constituted a seizure.  It is clear to the court, however, that the facts alleged by plaintiffs would not even arguably have warranted a reasonable officer in suspecting at the start of the encounter that criminal activity may have been afoot.  See United States v. Alvarez, 40 F.4th 339, 344 (5th Cir. 2022) ("Whether officers had reasonable suspicion to support an investigative stop is a question of law" for the court). Plaintiffs' allegation to the contrary is a legal conclusion, which the court is not required to assume is true.  See Parsons v. Marmarinos, No. 1:14-CV-01122-LY, 2015 WL 5098807, at *5 (W.D. Tex. Aug. 21, 2015) (allegation that defendants deprived plaintiff of his right to be free from "unjustified seizure" is a legal conclusion that is not entitled to the presumption of truth at the motion to dismiss stage).

[4]    Plaintiffs allege that Rose parked directly behind them, but the dashcam video clearly shows that there was ample room between the two vehicles to allow for egress.

... run a computer check on both [and] [to] ask the occupants about their intended destination."); United States v. Anthony, 487 Fed. Appx. 921, 922 (5th Cir. 2012) (there was no seizure where officers approached the defendant in public parking lot to ascertain his identity, parked patrol car so as to leave room for him to leave and did not brandish their weapons or advise him that he could not leave the area).

What began as a consensual encounter, however, undeniably became an investigative detention that under Terry, was required to be supported by reasonable suspicion.  Because a seizure must be justified "at its inception," the first question that arises is, at what point were plaintiffs seized; then the question becomes whether, at the moment they were seized, there existed reasonable suspicion, supported by specific and articulable facts, that plaintiffs were or had been engaged in criminal activity.  See United States v. Hill, 752 F.3d 1029, 1033 (5th Cir. 2014).

Here, plaintiffs were seized when Rose did not return their licenses after they were run and came back clean.  See United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999) (holding that "'what began as a consensual encounter quickly became an investigative detention once the agents received [defendant's] driver's license and did not return it to him.'" (quoting United States v. Lambert, 46 F.3d 1064, 1068 (10th Cir. 1995)).

Defendants maintain that reasonable suspicion arose before Rose asked for plaintiffs' identification, based on the fact that she had seen the empty whiskey bottle and observed that Wogan's speech was difficult to understand and he had difficulty keeping his eyes open, and that further reasonable suspicion arose over the course of the stop.  Plaintiffs, on the other hand, charge in Count II, that reasonable suspicion was lacking throughout the encounter and that Rose and Bridges, with no basis for reasonable suspicion, unlawfully extended the stop, engaging in what plaintiffs describe as a "fishing expedition" in hopes of uncovering evidence of some kind of criminal activity with which to charge them.

Under Terry, if law enforcement officers can point to specific and articulable facts that lead them to reasonably suspect that a particular person is committing, or is about to commit, a crime, they may briefly detain (seize) a person to investigate.  United States v. Hill, 752 F.3d 1029, 1033 (5th Cir. 2014) (citing United States v. Jordan, 232 F.3d 447, 448 (5th Cir. 2000)).  "Such a belief must be founded on specific and articulable facts rather than on a mere suspicion or 'hunch.'"  Id. (quoting United States v. Sanders, 994 F.2d 200, 203 (5th Cir. 1993)).

Where reasonable suspicion does exist, the "investigative detention, or Terry stop, 'must be carefully tailored to its

underlying justification.'" Emesowum v. Cruz, 756 Fed. Appx. 374, 378–79 (5th Cir. 2018) (quoting Florida v. Royer, 460 U.S. 491, 498, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). "Whether any particular stop is reasonable varies with the facts on the ground[, but] '[t]his much ... is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate'" the purpose of the seizure at its inception. Id. (quoting Royer, 460 U.S. at 500, 103 S. Ct. 1319).

In evaluating the lawfulness of a Terry stop, "[c]ourts ... inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop," United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004), and "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005).

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's

14

shield against unreasonable seizures." Rodriguez v. United States, 575 U.S. 348, 350, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015).  That said, the "Fourth Amendment tolerate[s] certain … investigations" that are unrelated to initial justification for a Terry stop; but "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'"  Id. at 355-56, 135 S. Ct. 1609 (quoting Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)).  See also Illinois v. Caballes, 543 U.S. 405, 406, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" that justified the stop).

In other words, once an officer has completed, or reasonably should have completed, the normal tasks associated with the purpose of a Terry stop, he cannot prolong the stop to investigate other criminal activity, unless he learns new information that gives "reasonable suspicion and articulable suspicion that criminal activity is afoot" so as to justify further detention.  See Rodriguez, 575 U.S. at 354, 135 S. Ct. 1609 ("Authority for the seizure thus ends when tasks tied to the [purpose of the stop] are—or reasonably should have been—completed.").

Of relevance here, once an officer has completed, or with reasonable diligence should have completed, the investigation

15

reasonably related to either the circumstances that justified the stop or to dispelling reasonable suspicion developed during the stop, the officer may not prolong the stop in order to conduct a dog sniff.  Rodriguez, 575 U.S. at 354-55, 135 S. Ct. 1609.  In other words, a dog sniff is improper if it measurably extends the duration of a traffic stop without reasonable suspicion to justify that extension.  See id., 575 U.S. at 357, 135 S. Ct. 1609; cf. United States v. Spears, 636 F. App'x 893, 901 (5th Cir. 2016) ("[A]bsent reasonable suspicion of additional criminal activity, waiting for or conducting a dog sniff cannot prolong a stop justified by only a traffic violation beyond the amount of time reasonably required to complete the mission of issuing a traffic ticket....").

As stated, plaintiffs allege that there was no reasonable suspicion for the officers to have detained them even momentarily.  But they also allege once they were detained, Rose and Bridges did not act diligently to dispel Rose's contrived claim of reasonable suspicion relating to the empty whiskey bottle, and also, that officers, without developing any further reasonable suspicion, unlawfully extended the duration of the stop and specifically and intentionally prolonged the stop in order to conduct a dog sniff.

Defendants deny this and argue that not only were they not able to quickly and diligently dispel Rose's initial reasonable

suspicion that Wogan had driven while impaired or that he would do so, but also that during the detention for investigation of his suspected impairment, "reasonable suspicion arose for additional criminal activity," which supported plaintiffs' further detention, including detention to await a drug sniff by Officer Johnson's drug dog, which then led to the search of Wogan's vehicle and to Wilkes' arrest.

In the court's opinion, the facts alleged in the complaint and set forth in the accompanying exhibits are sufficient to state a claim against Rose and Bridges for unlawful detention in violation of plaintiffs' Fourth Amendment rights and to overcome Rose's and Bridges' qualified immunity. Defendants assert Rose had reasonable suspicion to believe Wogan had driven (or would drive) while impaired based on the presence of an empty Fireball Whiskey bottle on the backseat and the facts that Wogan's speech was difficult to understand and he had difficulty keeping his eyes open. Yet Rose, and then Bridges, who arrived on the scene within a few minutes of the initial encounter, are alleged to have detained plaintiffs for more than twenty minutes after Rose first observed the whiskey bottle before asking Wogan to submit to a field sobriety test, which could reasonably be found to be longer than was reasonably necessary to investigate (or at least begin to investigate) Wogan's sobriety. See Dortch, 199 F.3d at 199 (stating that in determining whether a seizure is

justifiable on reasonable suspicion, the court must "consider
the law enforcement purposes to be served by the stop as well as
the time reasonably needed to effectuate those purposes."
(quoting United States v. Sharpe, 470 U.S. 675, 105 S. Ct. 1568,
84 L. Ed. 2d 605 (1985)).  Moreover, accepting the complaint's
allegations as true, nothing transpired during that time that
would have created any further reasonable suspicion of criminal
activity.

    According to the complaint, immediately after she first
received plaintiffs' driver's licenses at the start of the
encounter, Rose asked Wogan about the empty whiskey bottle, and
both Wogan and Wilkes stated they had not been drinking that
night and that it was an old bottle.  At that point, before
calling in plaintiffs' licenses, Rose radioed for Bridges to
join her at the scene.  Plaintiffs' licenses came back clean
within a couple of minutes; yet Rose did not return them to
plaintiffs.  Instead, she continued conversing with plaintiffs
for several minutes about their work (driving food delivery for
various businesses, e.g., Door Dash).  When Bridges arrived a
few minutes later, Rose and Bridges both began questioning
plaintiffs about whether they had anything illegal in the car.
Rose asked Wogan, Any weapons?  Marijuana?  Heroin?  Cocaine?
He responded no to all her questions.  She asked, "Can I check?"
He said, "No."  In the meantime, two more officers arrived.

Bridges told Wogan, "If you have something small, petty, in here, go ahead and be honest now, because if we have to find, find something, find it the hard way, um, can't really help you out."  Wogan continued to respond there was nothing illegal in the vehicle.  Bridges persisted, asking several more times whether there was anything illegal in the vehicle, and asking, "Would there be any reason for a K-9 to alert on your vehicle." Wogan said "No."

This went on for several minutes before Bridges instructed Wogan to "Hop out of the car," which he did.  Rose again asked Wogan, "So you haven't had anything to drink tonight?"  He said, "No."  "When was the last time you had something to drink?"  He responded, "Two or three days ago."  She began asking Wogan about the couple's travels:  how long had they been on the road, where all had they been, where were they going, where they had stayed, why they chose to stay at casinos.  Several minutes into this questioning, and some fifteen minutes into the stop, Wogan asked: "Am I not free to leave?"  Rose did not respond.

Bridges, on the passenger side of the car, was questioning Wilkes:  He asked if she had ever been arrested, and she told him she had been arrested a year ago for possession of methamphetamine.  He asked, "How much meth is in the vehicle tonight?"  She said, "None."  He asked, "How much meth is on you

or on him?  If a dog comes out there's no reason for him to alert on the vehicle?"  Again, she said, "No."

A couple of minutes later, Wogan again asked, "Am I being detained?"  Bridges said, "Yeah," at which point Wogan said, "I am not answering any more questions."  Bridges and Rose stepped away to call defendant Johnson, a K-9 officer, to bring his drug dog; and only then, after returning from calling Johnson to bring out his dog for a drug search, and over twenty-two minutes into the stop, did Rose first ask Wogan if he would "be willing to perform some tests for me to make sure you are good to be driving before we send you on your way."

A "20-minute stop is [not] unreasonable when the police have acted diligently and a suspect's actions contribute[d] to the added delay about which he complains."  <u>United States v. Sharpe</u>, 470 U.S. 675, 688, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).[5]  But that is not what plaintiffs have alleged occurred here.  Accepting that the detention may initially have been

---

[5]    Defendants argue that the stop was extended only because Wogan refused to submit to a field sobriety test.  By the time Wogan declined to submit to a field sobriety test, plaintiffs had already been detained for what plaintiffs allege was an unreasonably extended time, in violation of the Fourth Amendment.  <u>Cf</u>. <u>United States v. Dortch</u>, 199 F.3d 193, 200 (5th Cir. 1999) (delay in arrival of canine unit not attributable to defendant where officers themselves delayed approximately 9-10 minutes into the stop before first requesting that dispatch send the canine unit).

justified by reasonable suspicion, or arguable reasonable suspicion that Wogan may have driven or would drive impaired,[6] plaintiffs have alleged sufficient facts to support a finding that Rose and Bridges did not *diligently and without delay* "pursue[] a means of investigation that was likely to confirm or dispel their suspicions quickly." Sharpe, 470 U.S. at 686, 105 S. Ct. 1568.

Plaintiffs' allegations, which the court accepts as true for purposes of defendants' motion, also tend to show that no new reasonable suspicion was developed, or arguably developed during any legitimate period of detention that would have supported plaintiffs' continued detention. Defendants claim that Rose purportedly noticed that Wogan had "body tremors" when he first exited the vehicle, which she thought could possibly indicate narcotics use. But this alone would not arguably have created reasonable suspicion to further detain plaintiffs. The officers also learned during their questioning that seven years earlier, Wogan had been arrested for drug possession and that Wilkes (whom they did not claim to have suspected was impaired) had been arrested a year earlier for possession of methamphetamine. But the fact of these prior arrests, even when

---

[6]    Neither officer claimed to have suspected that Wilkes was impaired or unable to drive, and Wilkes, in fact, volunteered that she was good to drive.

coupled with Wogan's body tremors, would not have created

reasonable suspicion that defendants were engaged in any drug-

related activity, as implied by defendants.[7]

---

[7]    Plaintiffs contend the dashcam/bodycam video shows defendants knew they lacked reasonable suspicion. They point to Bridges' comment, 15 minutes into the stop, that plaintiffs were "sketchy" but there was "not much to go on"; the fact that Bridges admitted to Johnson, "[W]e don't have anything else other than" Wilkes' prior arrest and that fact that Wogan "wasn't saying anything"; that Bridges told Johnson that if he did not want to bring the dog out, "we'll let them go," showing he knew there was no legitimate basis for plaintiffs' detention. They also claim an exchange between officers while Johnson was in transit shows defendants contrived the field sobriety tests as a way to prolong the detention until the drug dog arrived. During this exchange, an officer suggested, "You could always, you could offer him, if you can like ask him if he's had anything, if he doesn't mind taking FSTs, make sure he's good to drive. That way while we are waiting for [inaudible] to come out…." And even as Rose then began conducting these tests, Bridges remarked, "I don't think he's been using."

Plaintiffs point out further that more than 30 minutes into the stop, after remarking that "something ain't right" about Wogan, Bridges commented, "I don't know if he's skamming, skimming, credit card stuff, checks, I don't know," suggesting, according to plaintiffs, that Bridges had no articulable suspicion as to any possible crime either plaintiff may have committed. And, even before the dog allegedly alerted to the presence of drugs, Bridges said, "*When we arrest them*, we need to articulate all the reasonable suspicion" (emphasis added), which plaintiffs claim shows that defendants intended to arrest them for *something*, even before the search which revealed the paraphernalia for which Wilkes was ultimately arrested.

Plaintiffs may be correct that these facts are telling as to defendants' subjective intentions. However, "[t]he officers' objective conduct, not their subject[ive] intentions or private conversations, is relevant to the seizure determination." United States v. Mask, 330 F.3d 330, 337 (5th Cir. 2003) (citing Michigan v. Chesternut, 486 U.S. 567, 576 n.7, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)("[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted")).

As plaintiffs' allegations, accepted as true, are
sufficient both to establish that they were illegally detained
in violation of their Fourth Amendment rights, and to overcome
defendants' qualified immunity, the motion as to Count II will
be denied.

Count V:  Fourth Amendment Unreasonable Search

(Rose, Bridges and Johnson)

Eighteen minutes into the stop, Rose and Bridges called K-9
Officer Johnson to see if he would come out with his drug dog.
After a two-minute discussion, Johnson said he was on his way.
He arrived about ten minutes later.

In the interim, Rose approached Wogan and asked if he
"would be willing to perform some tests for me to make sure you
are good to be driving."  Wogan said he would submit to a
breathalyzer, but citing the facts that he just woke up and that
he was having hip pain, he declined any test that involved
walking.  Rose persisted, and although Wogan repeatedly declined
and repeatedly offered to take a breathalyzer test instead, he
eventually relented.  After about five minutes, Wogan asked
Rose, "You guys aren't trying to extend this traffic stop
waiting on a dog, are you?"  He told her, "Twenty minutes is a
Terry stop; it's been twenty minutes.  I'm not intoxicated,

---

Plaintiffs do not allege that any of the cited comments were
conveyed to them.

obviously.  You don't need to do every test in the book to know
I'm not intoxicated."  When Rose asked if he would "do just one
more test for me," he said, "Not if it's going to take five
minutes."  He again said he would take a breathalyzer, and again
insisted he had not had anything to drink in days.  Bridges, at
that point, started in again questioning him about his and
Wilkes' drug use, which Wogan denied.  Wogan told Rose, once
more, "Obviously I haven't been drinking.  I mean I am not going
to do [another test] if you guys are waiting on a dog.  You're
not going to sit here and keep testing me and testing me until a
dog gets here."  He insisted he was "fine to drive," and asked
why he was not free to leave; Rose did not respond but continued
with testing.  Once Johnson arrived, Wogan informed the officers
that he did not consent to the dog walking around his car.

Johnson walked the dog to the vehicle, and within twenty
seconds, announced there was a "positive alert."  The officers
began a comprehensive, painstaking search of the vehicle and its
contents, but found no drugs.  They found no drugs on Wogan or
Wilkes, either, but they did find a "dugout and a pipe" in the
bottom of Wilkes' backpack/purse.  Wilkes was arrested on a
misdemeanor charge of possession of drug paraphernalia.

In Count V of the complaint, plaintiffs allege that
defendants Rose, Bridges and Johnson participated in an illegal
search of their vehicle during their unlawful detention.  And in

Count VI, Wilkes asserts a claim for false arrest based, in part, on the illegality of the search that purportedly created probable cause for her arrest.

Defendants argue there was probable cause for the search because the dog alerted to the presence of drugs and that plaintiffs therefore cannot succeed on their unreasonable search and seizure claims.  See United States v. Masterson, 450 Fed. Appx. 348, 349 (5th Cir. 2011) ("When a dog alerts to the possibility of narcotics hidden in the vehicle, probable cause to search the vehicle for contraband is established."); see also Caballes, 543 U.S. at 409, 125 S. Ct. 834 ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.").  For their part, plaintiffs, citing various reasons, allege that the drug dog did not alert, as Johnson had claimed, and that he falsified the positive alert as a means to manufacture probable cause for a search.  They thus contend the officers had no probable cause to support their illegal, warrantless search of the vehicle.

In their motion, defendants assert as a fact that the drug dog alerted to the presence of drugs, without bothering to address plaintiffs' allegations to the contrary.  Assuming what plaintiffs allege is true, that Johnson created a false alert or

falsely claimed that the dog alerted, there was no probable cause for the search of the vehicle and the search was unlawful. And if is true that Johnson falsified a positive alert to manufacture probable cause, he obviously would not have qualified immunity.

Rose and Bridges, in contrast, would have qualified immunity for a claim that Johnson falsely manufactured probable cause for the search, since there are no facts alleged to suggest that either had any reason to doubt Johnson's statement that that there was a positive alert or to undermine their reliance on his statement.[8] See Jones v. Fountain, 121 F. Supp. 2d 571, 574 (E.D. Tex. 2000) (officer told bo dog handler that dog had picked up a scent from inside the vehicle and who then searched plaintiff's car based on his belief that the dog "alerted" was entitled to qualified immunity).

On the other hand, plaintiffs' allegations that Rose and Bridges illegally detained them prior to the dog's purported alert and prolonged their detention for the specific purpose of conducting a dog sniff are sufficient to state a claim that the

---

[8]    When multiple officials are named as defendants, courts must assess each defendant's conduct "independently to determine whether he is entitled to qualified immunity." Solis v. Serrett, 31 F.4th 975, 981 (5th Cir. 2022). See Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 395 (5th Cir. 2000) ("[P]rudence and our own precedent dictates that we examine each individual defendant's entitlement to qualified immunity separately.").

search was illegal and to overcome Rose's and Bridges' qualified immunity for the allegedly illegal search.  See Rodriguez, 575 U.S. at 357, 135 S. Ct. 1609; see also Dortch, 199 F.3d at 200 (although the fact that the drug dog alerted to the presence of drugs in defendant's vehicle "established probable cause to search the interior of the car and to detain Dortch until a more thorough search could be completed, by then it was too late: Any probable cause established as a result of the canine search was subsequent to the unlawful seizure" and hence was illegal).

Count VI: Fourth/Fourteenth Amendment Unlawful Arrest (Rose)

As stated, Wilkes was arrested for possession of drug paraphernalia, but the charges were dismissed.  She has asserted in Count VI a claim for unlawful arrest, in violation of her Fourteenth Amendment due process rights.[9]  The theory underlying her claim is not entirely clear but, particularly since she acknowledges that drug paraphernalia was found in her backpack, her position seems to be that because the search was illegal,

---

[9]    Defendants argue that this claim should be dismissed because "a claim for false arrest is rooted not in the Fourteenth Amendment, but rather in the Fourth Amendment's right to be free from unreasonable seizures."  Tinoco v. City of Hidalgo, Texas, No. 23-40543, 2025 WL 655079, at *7 (5th Cir. Feb. 28, 2025).  If she could potentially state a Fourth Amendment claim for false arrest, the court would allow Wilkes to amend to attempt to state such a claim.  Clearly, however, she has no potentially cognizable claim on the facts alleged.

then her arrest based on the fruits of that search was likewise illegal.[10]  However, such a theory fails as a matter of law, as it "equates to applying the exclusionary rule in a civil action when this rule has been restricted for use solely in criminal cases."  Lewis v. LoCicero, Civ. A. No. 15-00129-BAJ-EWD, 2017 WL 5957098, at *1 (M.D. La. Dec. 1, 2017) (citing United States v. Janis, 428 U.S. 433, 447, 96 S. Ct. 3021, 49 L. Ed. 2d 1046

---

[10]    She may be asserting, alternatively, that Rose violated her federal rights by arresting her in contravention of Mississippi Code Annotated § 99-3-7, which Wilkes reads as allowing a warrantless arrest for a misdemeanor offense only where there is an outstanding warrant or the offense was committed in the arresting officer's presence and involved a breach of the peace or an indication that the person arrested was a threat to herself.  If that is her position, her claim fails as a matter of law for two reasons.  First, "[a]n alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution," Jones v. Lowndes Cnty., Miss., 678 F.3d 344, 352 (5th Cir. 2012) (quoting Moore v. Marketplace Rest., Inc., 754 F.2d 1336, 1349 (7th Cir. 1985)); and there is no federal constitutional right only to be arrested for misdemeanors in limited circumstances.  Second, Mississippi law clearly authorizes the warrantless arrest of a person for *any* misdemeanor committed in the arresting officer's presence.  See S.M.K.S. v. Youth Court of Union Cty., 155 So. 3d 747, 750 (¶ 10) (Miss. 2015) ("It is well settled that an officer may make an arrest for a misdemeanor committed in his presence without a warrant." (quoting Bird v. State, 154 Miss. 493, 122 So. 539, 540 (1929))); City of Vicksburg v. Williams, 294 So. 3d 599, 603 (Miss. 2020) (Kitchens, J., concurring in part) ("Section 99-3-7 empowers a police officer to arrest someone for a misdemeanor offense in two circumstances: when an arrest warrant is outstanding or when the offense is committed in the officer's presence.").

(1976); Wren v. Towe, 130 F.3d 1154, 1158 (5th Cir. 1997);
Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999)
("The lack of probable cause to stop and search does not vitiate
the probable cause to arrest, because (among other reasons) the
fruit of the poisonous tree doctrine is not available to assist
a § 1983 claimant.")).  See also De La Paz v. Coy, 786 F.3d 367,
371 n.3 (5th Cir. 2015) ("[B]oth plaintiffs err in arguing that
their arrests lacked probable cause where the answers to the
agents' questions were 'fruit of the poisonous tree' of their
traffic stops.  No court has yet applied this criminal law
doctrine to civil cases like immigration proceedings." (citing
I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1051, 104 S. Ct. 3479,
82 L. Ed. 2d 778 (1984); Townes, 176 F.3d at 146)); Davis v.
Foley, No. 3:17-cv-278-M-BN, 2018 WL 5723165, at *7 (N.D. Tex.
Oct. 12, 2018) (same).

Wilkes also charges in Count VI that Rose violated her
rights under the Fourteenth Amendment's Equal Protection Clause
by treating her, an out-of-state resident, differently from
Mississippi residents charged with the same offense.  In their
motion, defendants argue that Wilkes' claim should be dismissed
because she has not plausibly pled any facts to suggest that she
was treated differently from any other similarly-situated
comparators.  In this regard, Wilkes alleges that at the time of
her arrest, she asked Rose to give her a ticket instead of

arresting her; Rose responded, in substance, that she was
arresting Wilkes because Wilkes was from out of state, implying,
according to Wilkes, that had she been a resident of
Mississippi, she would not have been arrested but merely
ticketed.

The Equal Protection Clause of the Fourteenth Amendment
"prohibits selective enforcement of the law based on
considerations such as race." Whren v. United States, 517 U.S.
806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).  To prevail
on a claim of selective prosecution, a plaintiff "must show that
others similarly situated have not been subject to enforcement
proceedings by the government and that there was an
impermissible basis for the decision to institute enforcement
action against [her], 'such as race, religion, or other
arbitrary classification.'"  United States v. v. Sage
Pharmaceuticals, Inc., 210 F.3d 475, 480 (5ᵗʰ Cir. 2000) (quoting
United States v. Armstrong, 517 U.S. 456, 464, 116 S. Ct. 1480,
1486, 134 L. Ed. 2d 687 (1996)).  In the court's view, while
Wilkes has not identified a specific comparator, she has
adequately alleged that she was treated differently by Rose
because of her classification as a nonresident.

Nevertheless, and without deciding whether an officer's
decision to arrest rather than ticket an individual because she
is from out of state would constitute an equal protection

violation, the court concludes that Rose is entitled to qualified immunity because Rose did not violate any "clearly established" right.[11]  To reiterate, a right is "clearly established" when "every reasonable official would have understood that what he is doing violates that right" and "existing precedent [has] placed the statutory or constitutional question beyond debate."  Ashcroft, 563 U.S. at 741, 131 S. Ct. 2074.  Because residency is not a suspect classification, what is required to support a difference in treatment is a rational relationship to a legitimate state interest.  See Hernandez v. Bailey, 716 Fed. Appx. 298, 304 (5th Cir. 2018).  "[A] classification survives rational basis review 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  Big Tyme Investments, L.L.C. v. Edwards, 985 F.3d 456, 469 (5th Cir. 2021) (quoting F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)).  No case, authoritative or otherwise, has held that there can exist no rational basis for treating residents and nonresidents differently in this or any

---

[11]    "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."  Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (citing Pearson v. Callahan, 555 U.S. 223, 227, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

analogous context.  On the contrary, courts have rejected equal protection claims on similar allegations.  See Hopkins v. Claroni, Civil No. 1:13-CV-229-DBH, 2015 WL 2371654, at *4 (D. Me. May 18, 2015) (dismissing claim that arrest allegedly motivated by fact that plaintiff was from out of state violated his equal protection rights, and stating, "I reject the proposition that a law enforcement officer's discretionary choice of whom to arrest, when it is not based on a suspect classification like race, is a violation of equal protection."); cf. Bell v. City of Harrisburg, No. 1:08-CV-01563, 2010 WL 5559503, at *12 (M.D. Pa. June 8, 2010) (stating, "In the absence of clear authority showing that a full custodial arrest, supported by probable cause, burdens an out-of-state citizen's right to travel, the best conclusion is that defendants' arrest of the plaintiffs was fully lawful, and plaintiffs' Equal Protection claim fails.").  Accordingly, this claim will be dismissed based on Rose's qualified immunity.

  Count VIII:  Failure to Intervene (Bridges and Johnson)

  A claim under § 1983 for a failure to intervene can lie where an officer (1) knows that a fellow officer is violating an individual's constitutional rights, (2) is present at the scene of the constitutional violation, (3) has a reasonable opportunity to prevent the harm, but (4) chooses not to act. Joseph ex rel. Estate of Joseph v. Bartlett, 981 F.3d 319, 343

(5th Cir. 2020).  Plaintiffs rather vaguely allege that Bridges
and Johnson failed to intervene, charging that Bridges failed to
intervene "[u]pon [his] arrival at the scene and during
subsequent interactions with Defendant Rose," and that Johnson
and Bridges failed to intervene "[d]uring a phone call between
[them] where discussions allegedly included improper
procedures."  While defendants argue for dismissal of these
claims on the basis that plaintiffs have not plausibly pled any
constitutional violation, the court has concluded that
plaintiffs have pled cognizable claims for violations of their
constitutional rights.  Plaintiffs' claim for failure to
intervene fails for other reasons, however.

     First, no constitutional violation was occurring at the
time Bridges first arrived on the scene.  At that time, Rose was
still engaged in a consensual encounter with plaintiffs.
According to plaintiffs' own allegations, as the encounter
progressed, Bridges was not merely a bystander but rather was at
least as much an active, direct participant as Rose in the
specific alleged violations of plaintiffs' constitutional
rights.  And as one court has put it, "[o]bviously, a person who
is held liable under a theory of direct participation in the
constitutional violation cannot also be held liable for a
failure to intervene."  Rizk v. City of New York, 462 F. Supp.
3d 203, 226 (E.D.N.Y. 2020) (citing Jackson v. City of New York,

939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013) (quoting <u>Jean-Laurent</u>
<u>v. Wilkinson</u>, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008))).

As for Johnson, during his phone conversation with Bridges,
which plaintiffs have identified as the sole basis for his
liability for failure to intervene, Johnson was not present at
the scene but rather was at home in bed.  He was not in a
position to personally assess the situation or to intervene and,
as a matter of law on the facts alleged, cannot be held liable
for failing to do so.

<u>Counts III and IX: False Affidavits (Johnson and Rose)</u>

In Count III, plaintiffs allege that Officer Johnson
"utilized a false affidavit to secure probable cause, leading to
a warrantless search of [the] vehicle," in violation of
plaintiffs' Fourth Amendment rights.  Regarding this charge,
plaintiffs point, not to an affidavit but to Johnson's post-
incident investigative report in which he wrote, "K9 Titus
showed JND (just noticeable difference) at the driver's side
door and he went into a final response on the driver's door
seam.  Titus's response showed a positive alert for odor of an
illegal narcotic."  Plaintiffs allege that "neither an active
nor passive response took place" and that Johnson's statement in
his report that the dog alerted was false.

In a similar vein, plaintiffs charge in Count IX that
defendant Rose "intentionally submitted a misleading and false

34

investigatory report" in which she "distort[ed] critical details about Wogan's physical condition, actions, and statements during the encounter."

The Fifth Circuit has plainly held that "there is no right to a complete accurate police report." Smith v. Patri, 99 F. App'x 48987, 498 (5th Cir. 2004) (per curiam). See also Rich v. Palko, 920 F.3d 288, 297 (5th Cir. 2019) (affirming finding of qualified immunity where the plaintiff "fail[ed] to identify a single case suggesting that an individual has a right to be free from inaccuracies in an after-the-fact police report or that an inaccurate report serves as a sort of continuing constitutional violation…."); Jarrett v. Twp. of Bensalem, 312 F. App'x 505, 507 (3d Cir. 2009) ("[T]he mere existence of an allegedly incorrect police report fails to implicate constitutional rights.") (cited in Rich).

Plaintiffs' allegations are clearly based on allegedly false statements contained in Johnson's and Rose's post-incident reports, prepared after the detention, search and arrest, and which statements/reports did not result in any further alleged constitutional deprivation.  Accordingly, these claims will be dismissed.[12]

---

[12]    Plaintiffs' related state-law perjury claims will also be dismissed.  See infra 41-42.

<u>Count XII & XIII: Deprivation of/Conspiracy against Rights</u>

Plaintiffs have asserted claims in Counts XII and XIII against Rose, Bridges and Johnson for alleged "deprivation of rights" and "conspiracy against rights" in violation of 18 U.S.C. §§ 241 and 242, respectively.  However, as defendants point out, these are criminal statutes for which there is no private civil right of action.  See <u>Farwell v. Rushing</u>, No. 22-20157, 2024 WL 4708917, at *1 (5th Cir. Nov. 7, 2024) (citing <u>Ali v. Shabazz</u>, No. 93-2495, 1993 WL 456323 (5th Cir. Oct. 28, 1993)).

<u>COUNT XIV: Monell Liability – City of Ridgeland</u>

Plaintiffs allege that the City of Ridgeland, as the employer of Rose, Bridges and Johnson, is vicariously liable for their actions.  Alternatively, they allege that the City's policies, customs and practices were a direct cause of the alleged violations of their constitutional rights.

A municipality cannot be sued under § 1983 on a theory of vicarious liability for the actions of its employees; rather, a municipality can be held liable only for acts directly attributable to it, through an official policy that caused the alleged constitutional violation.  <u>Monell v. Dept. of Social Svcs. of City of New York</u>, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  This means that plaintiffs cannot prevail on their § 1983 claims against the City merely by

36

showing that one or more of the defendant officers violated their constitutional rights.  Instead, to state a claim against the City (and against the individual defendants in their official capacities), plaintiffs must allege, in addition to a violation of their constitutional rights, that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009).[13]  The three requirements – "a policymaker, an official policy and the 'moving force' of the policy – are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001).

An "official policy" may take the form of a "policy statement formally announced by an official policymaker" or a "persistent widespread practice of city officials or employees,

---

[13]    Plaintiffs have sued Rose, Bridges and Johnson in their individual and official capacities.  In the context of § 1983, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and therefore, "it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).  Thus, in lawsuits against municipal actors in their official capacities, plaintiffs must plead and prove the same elements that they must plead and prove against the municipality. Zapata v. Hays Cnty. Juvenile Detention Ctr., No. 23-50191, 2023 WL 7870596, at *6 (5th Cir. Nov. 15, 2023).

37

which, although not authorized by officially adopted and
promulgated policy, is so common and well settled as to
constitute a custom that fairly represents municipal policy."
Brown v. Tarrant Cnty., Texas, 985 F.3d 489, 497 (5th Cir. 2021)
(quoting Zarnow v. City of Wichita Falls, Tex., 614 F.3d 161,
168-69 (5th Cir. 2010)).  Also, "[a] single decision may create
municipal liability if that decision were made by a final
policymaker responsible for that activity."  Woodard v. Andrus,
419 F.3d 348, 352 (5th Cir. 2005) (quoting Brown v. Bryan Cnty.,
67 F.3d 1174, 1183 (5th Cir. 1995)).

Plaintiffs attached to their complaint several exhibits
which they contend demonstrate an official City of Ridgeland
policy of tolerating police misconduct.  The first such exhibit
is a May 2018 paper authored by several Georgia law students
which plaintiffs' characterize as documenting the students'
observations of ongoing civil rights violations in a Ridgeland,
Mississippi courtroom.  Plaintiffs allege this paper reveals "a
pattern of civil rights violations committed by Prosecutor
[Boty] McDonald, indicating a lack of oversight and
accountability within the City of Ridgeland."  The second is a
list of ten cases in which Prosecutor McDonald was chastised by
the Mississippi Supreme Court and Court of Appeals for failing
to file briefs on appeal.  These exhibits plainly do not tend to
demonstrate the existence of any official policy, much less a

38

policy that has relevance to the alleged constitutional violations at issue in this case.

Next, plaintiffs offer an internet article about a 2008 case in which former Ridgeland Officer Daniel Soto was found to have committed perjury in a DUI case which led to a new trial for the defendant and to Soto's resignation.[14]  Plaintiffs allege that the City's failure to hold Soto accountable created an atmosphere of tolerance of perjury, which led to the actions of Rose and Johnson making false statements in this case. Obviously, however, an incident of perjury by a single officer more than ten years before the subject incident cannot establish a relevant policy, and especially not, given that, as reported in the article offered by plaintiffs, the offending officer was told by Ridgeland's police chief to "quit or be fired."

Lastly, plaintiffs allege that S. Doe, a supervisor who arrived on the scene of their detention, ratified the unconstitutional actions of Rose, Bridges and Johnson, both by failing to question their actions and "accepting responses that did not follow proper procedures."  Plaintiffs argue that "[t]he Supervisor – who holds ultimate decision-making authority on scene— endorsed the unlawful detention and justified based on incorrect legal standards," and that as the authorized

---

[14]    See https://kingfish1935.blogspot.com/2010/04/award-winning-ridgeland-police-officer.html.

policymaker, by his actions established City policy.  Plaintiffs are mistaken.  Only final policymakers establish policy by their actions; and a mere on-scene supervisor assuredly does not have final policymaking authority for the City of Ridgeland Police Department.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) ("Whether an official has final policymaking authority is an issue of law to be determined by the court by reference to state and local law.").

STATE LAW CLAIMS

Count VII: Unlawful/False Arrest (Rose)

Defendants argue that Wilkes' state law claim for false arrest is governed by the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. § 11-46-1 et seq., and is barred by one or more MTCA provisions, including its one-year statute of limitations. See Miss. Code Ann. § 11-46-1(3) (establishing one-year statute of limitations for claims covered by MTCA).  It is clear, however, that under Mississippi law, "[f]alse arrest is an intentional tort, arising when one causes another to be arrested falsely, unlawfully, maliciously and without probable cause," City of Mound Bayou v. Johnson, 562 So. 2d 1212, 1218 (Miss 1990), and therefore, is not covered by the MTCA, see Funchess v. Miss. Dept. of Corrections, Civ. Action No. 3:20-CV-502-HTW-LGI, 2025 WL 746527, at *7 (S.D. Miss. Mar. 7, 2025) ("[C]onduct

40

rising to the level of fraud or malice falls outside the protections of the MTCA." (citing Zumwalt v. Jones Cnty. Bd. of Supers., 19 So. 3d 672, 688 (Miss. 2009) (holding that acts committed with malice or criminal intent are beyond the scope of employment for MTCA purposes)).  However, while the claim is not barred by the MTCA's one-year statute of limitations, it is plainly barred by the one-year statute of limitations in Mississippi Code Annotated § 15-1-35.  See Miss. Code Ann. § 15-1-35 (establishing one-year statute of limitations for claims of false imprisonment); Burnett v. Hinds Cnty. by and Through Board of Supers., 313 So.3d 471, 477 (Miss. 2020) ("Burnett's claims of assault, battery, false arrest, and slander, to the extent they allege conduct by Sheriff Lewis that would fall outside of the MTCA, are clearly barred by Section 15-1-35.").

Under Mississippi law, a "complaint for false arrest and false imprisonment accrue[s] on the date of arrest."  Parker v. Mississippi Game & Fish Comm'n, 555 So. 2d 725, 727 (Miss. 1989).  Wilkes was arrested on July 26, 2021.  The complaint in this case was filed nearly three years later, on July 23, 2024, and therefore, this claim will be dismissed as time-barred.

Counts IV and X:  Perjury (Rose and Johnson)

In addition to their § 1983 claim against Johnson and Rose for allegedly making false statements in their incident reports, which the court has concluded must be dismissed, plaintiffs

41

allege that by this same conduct, Johnson and Rose committed perjury in violation of Mississippi Code Annotated § 97-9-59, which makes it a crime for a person to "wilfully and corruptly swear, testify, or affirm falsely to any material matter under any oath, affirmation, or declaration…." Plaintiffs cannot succeed on these claims because, among other reasons, "there is no recognized private right of action for perjury under Mississippi law." Blakely v. City of Laurel, Civil Action No. 2:14cv82-HSO-JCG, 2015 WL 13091648, at *4 (S.D. Miss. Sept. 17, 2015) ((citing Knotts by Knotts v. Hassell, 659 So. 2d 886, 889–90 (Miss. 1995) (holding that "no civil action may be based upon perjured testimony")); Pepper v. Homesales, Inc., Civil No. 1:08CV344-HSO-JMR, 2009 WL 544141, at *6 (S.D. Miss. Mar. 9, 2009) (citing Knotts by Knotts).

        Count XI:  Reckless Endangerment (Rose)

        Plaintiffs allege in Count XI that when transporting Wilkes from the Renaissance shopping center to the Ridgeland Police Department for booking, Rose, "in reckless disregard for safety and human life, committed two counts of speeding, recorded at 10 mph over the posted speed limit," and "[ran] two separate stop signs while executing left-hand turns at speeds greater than one would use for a rolling stop." Plaintiffs charge that Rose's commission of these traffic violations "exhibited a wanton indifference to the safety and well-being of Mrs. Wilkes" and

caused her "additional distress and harm."  Defendants acknowledge this claim in their motion but inexplicably do not argue for its dismissal.[15]

CONCLUSION

Based on the foregoing, it is ordered that defendants' motion is denied as to Count II against Rose and Bridges in their individual capacities for unlawful seizure and Count V against Johnson in his individual capacity for illegal search, and the motion is granted as to all other claims.[16]

SO ORDERED this 16th day of May, 2025.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[15]    Defendants do argue for dismissal of plaintiffs' claim for intentional infliction of emotional distress, but plaintiffs have not alleged a cause of action for intentional infliction of emotional distress.

[16]    Courts generally allow plaintiffs, especially pro se plaintiffs, "at least one opportunity to amend following a Rule 12 dismissal on the pleadings, 'unless it is clear that the defects are incurable,'" that is, when a complaint's facts are not actionable as a matter of law.  Amaru v. Rhome Police Dept., Civil Action No. 4:22-cv-01090-O-BP, 2025 WL 1076477, at *2-3 (N.D. Tex. Mar. 18, 2025) (quoting Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).  In such circumstances, amendment would be futile and dismissal with prejudice is appropriate.  Id. (citing Schiller v. Physicians Res. Grp., Inc., 342 F.3d 563, 566 (5th Cir. 2003)).  Courts may also dismiss without leave to amend if the court finds the plaintiffs have pled their best case.  Id. (citing Jones v. Greninger, 188 F.3d 322, 327 (5th Cir. 1999)).  Nearly all the defects addressed herein are incurable.  To the extent they are not, the court finds plaintiffs have pled their best case.